[Crim. No. 16799. In Bank. Apr. 18, 1974.]

In re ROBERT STURM on Habeas Corpus.

## Counsel

W. D. Milligan for Petitioner.

Charles C. Marson, Joseph Remcho, Peter E. Sheehan and Alice Daniel as Amici Curiae on behalf of Petitioner.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, Doris H. Maier, Assistant Attorney General, Harley D. Mayfield and Karl J. Phaler, Deputy Attorneys General, for Respondent.

## Opinion

**WRIGHT, C. J.** — We issued an order to show cause in response to the application of Robert Sturm for a writ of habeas corpus on allegations that the Adult Authority (Authority) denied petitioner due process of law in that it acted irresponsibly in first denying him parole and then refusing to communicate to him the reasons for the denial. We conclude that there has been a denial of due process. As the petitioner is presently on parole, the order to show cause is discharged and the petition for the writ is denied.

Almost a quarter century ago, petitioner and James McKay, who were then juveniles 18 and 19 years of age respectively, were convicted of murdering two deputy sheriffs (Pen. Code, §§ 187, 190)[1] who were returning

---

[1] All statutory references are to sections of the Penal Code unless otherwise specified.

the juveniles to California from the State of Washington after escape from a Youth Authority camp in Shasta County. Following a retrial which took place in Tehama County because of popular prejudice against them in Shasta County (*People* v. *McKay* (1951) 37 Cal.2d 792 [236 P.2d 145]), defendants were convicted a second time and were sentenced to life imprisonment. Immediately thereafter the trial judge and district attorney filed with the Authority a statement regarding length of sentence and granting of parole pursuant to section 1203.01. The statement not only recounted that the jury had returned its verdict with the express declaration that the defendants be imprisoned without parole, but also concurred in that view by cautioning that the defendants would "as long as they live be a menace to society and should be incarcerated." Additionally, the statement expressed an opinion drawn from the trial evidence that petitioner, "was the more alert of the two, and probably the leader in the plan to escape" even though the evidence showed that "defendant, James McKay, fired all the shots in the killing . . . ."[2]

Petitioner was committed to the Department of Corrections on February 26, 1952. He remained incarcerated for the next 22 years in various institutions, including those at Folsom, San Quentin, Vacaville, and Chino.[3] It appears from records of those institutions that petitioner's adjustment to custody was turbulent. During the first 11 years in prison he engaged in a series of serious disciplinary infractions—including fighting with other inmates, pilfering other inmates' belongings, destroying prison property, and refusing to obey guards—which resulted in confinement in isolation or maximum custody on several occasions. Furthermore, correctional counselors believed at the time that petitioner had almost no insight into the nature of his offense or concern about his future, and he was often observed to be in a state of chronic depression. This behavior, however, appears to have ceased in 1963 when he was disciplined for the last time. Petitioner has since refrained from committing infractions and has conducted himself in a manner which unquestionably has been exemplary. He has earned a high school diploma, successfully completed additional training to be an office machine repairman, and performed above-average work

---

[2]While the evidence at the first trial had conflicted as to which defendant had actually fired the shots (see *People* v. *McKay, supra,* 37 Cal.2d 792, 793), the evidence at the second trial tended to establish that defendant McKay fired all the shots. McKay later admitted to the Authority that he committed the actual shooting of both deputies.

[3]According to the petition and appended exhibits, 12½ years is currently the average term of incarceration for inmates convicted of first degree murder.

on institutional job assignments. His improvement in his conduct has been accompanied by increasing insight into the nature and consequences of his offense. At the same time, the psychiatric evaluation of petitioner's propensity for violence has changed from one of great social hostility to "no suggestion of hostility or aggressive thinking."

Throughout this maturation, petitioner has appeared annually before the Authority to receive consideration of his applications for parole. These parole release hearings appear to have been conducted in accordance with the Authority's usual procedures. (See *In re Tucker* (1971) 5 Cal.3d 171, 184-188 [95 Cal.Rptr. 761, 486 P.2d 657] (separate opinion by Tobriner, J.).) Under that practice, the hearing is generally held by two members of the Authority who ride circuit between various prisons. They are assisted by a correctional counselor from the particular institution where the hearing is being held. (Comment, *The California Adult Authority—Administrative Sentencing and the Parole Decision as a Problem in Administrative Discretion* (1972) 5 U.C. Davis L.Rev. 360, 372-373 [hereinafter referred to as *Administrative Sentencing*].) In the normal hearing, which generally lasts no more than 10 minutes due to the fact that the panel must hear approximately 25 cases a day, the customary practice is for one Authority member to·interview the inmate while the correctional counselor keeps minutes. Meanwhile the other Authority member usually reads a file pertaining to the next inmate who will appear, which file contains the cumulative case summary prepared by the prison staff and recommendations, if any, regarding his readiness for release. Following the brief appearance of the inmate the interviewing panel member states his proposed decision to the other panel member. There is rarely any disagreement between the two and their votes are recorded by the correctional counselor in the minutes. These notes constitute the only written record of the decision for the enlightenment of future panels. Usually they consist of a Form 279 which contains a summary of the impression the prisoner made on panel members at the interview, together with panel members' comments regarding the inmate and a Form 244 vote sheet indicating the decision.[4] (Cal. Criminal Law Practice (Cont. Ed. Bar 1964) pp. 577-578 [hereinafter referred to as Criminal Practice].) Some period of time after the hearing the inmate is officially informed of the results. If it is a denial, he meets with his correctional counselor who has had access to the hearing minutes and who attempts to explain the decision. (See Testimony of Louis S. Nelson, Warden in Hearings Before the Cal. Assem. Crim. Procedures Committee (Nov. 13-14, 1968) at p. 357.)

---

[4]The Form 279, entitled Evaluation At The Time Of Adult Authority Hearing, is divided into printed sections for observations and comments which are usually entered by hand.

In petitioner's case the hearings consistently resulted in parole denials. Prior to 1970, the denials show some recognition of petitioner's behavioral progress in periodic recommendations advising gradual reductions in his custodial status. The records are otherwise entirely cryptic and contain no unequivocal reasons for the Authority's action. Aside from a brief notation in 1967 that "time is the only factor" and an equivocal notation in 1968 that other factors were involved in petitioner's case, no specific grounds for denial are set forth.[5]

Although the precise rationale for parole denial thus is not apparent the records do provide a useful summary of information which was at the panel's disposal in considering the parole applications. In the Authority's earlier evaluations (1961-1965) references to petitioner's apathy and need for vocational training reflect that the panel was well informed of his institutional conduct and attitude toward reform. Similarly, later assessments (1965-1970) indicate the Authority's awareness of petitioner's improvement in conduct by repeated references to his developing skill as a machine repairman and his gradual acceptance of responsibility for a serious crime. The minutes of the meetings also disclose that the Authority considered certain letters concerning the petitioner's capacity for a successful parole. These included an annual letter from a judge of the Superior Court of Shasta County which opposed parole because petitioner had committed "the most aggravated crime of this generation in this county," letters on two occasions from the chief of police in Red Bluff advising against parole for the reason that the jury's choice of life imprisonment over the death penalty partially rested on an expectation that parole would be precluded, and a letter in another year from petitioner's sister advocating his release. The Authority also became aware during the latter part of the 1960's that petitioner would have a home with his aunt and uncle upon release.

In 1970 began the series of en banc parole release hearings with which this petition is principally concerned. Records of parole denials in 1970 and 1971 show that the Authority considered petitioner's completion of trade and high school education, his good conduct, and the fact that no letters favoring or opposing parole were on file. Brief notations in both years also reflect that the Authority discussed the seriousness of petitioner's offense, which panel members viewed as having an "undisputed element of premeditation." There is also some reference in the minutes to the fact that petitioner had been the leader during the course of criminal conduct. Petitioner wrote to the chairman of the Authority after the 1970 and 1971

---

[5]In 1958, 1962, and 1968, there are, however, oblique references to petitioner's turbulent disciplinary record and refusal to secure vocational training.

dispositions seeking reasons for the denials so that he could be guided in his future conduct. The chairman's response in mid-1971 stated no specific reason for denial of parole, but instead explained in general language that the Authority's decisions were customarily based upon "innumerable factors involving the rehabilitation of the individual and the safety of society."[6]

At the en banc hearing in 1972 parole was again denied. Discussion apparently centered on the basic facts taken into consideration the previous two years.[7] Immediately thereafter petitioner applied for review of the decision by another Authority panel on grounds that the denial had capriciously ignored his exemplary institutional record, the fact that his already-paroled partner was the "triggerman,"[8] and the personal-opinion character of the filed section 1203.01 statement attributing leadership in the crime to petitioner. Following affirmance of the denial of parole by the divided review board,[9] petitioner retained counsel.

Counsel immediately sought a reconsideration of the 1972 parole application. In preparing to file the reconsideration request, he sought access to petitioner's institutional records. Although he received the cooperation of the Authority in viewing most of petitioner's file, counsel was apparently not able to obtain certain medical, psychiatric and psychological records. Upon reconsideration in December of 1972, the Authority en banc examined all previously discussed information and a new letter from the San Diego County Sheriff which was favorable to the granting of parole. Parole was again denied, however, for the express reason that "petitioner had been leader and the more sophisticated of the two offenders." This statement of grounds was withheld from petitioner and his counsel under standard Authority policy. Counsel filed the instant petition in early 1973.[10]

 In the time intervening since the filing of the petition herein peti-

---

[6]The chairman was somewhat more specific when, some two months later, he wrote to an interested minister that petitioner had not been granted parole because of concern over "the degree of control he would exercise if released to the community."

[7]The Form 279 for this hearing merely recites the basic facts of petitioner's case, including the fact that the offense was "an execution type murder," that McKay had been the "triggerman," that petitioner had done well in the institution, and that he appeared to have been the leader and more sophisticated of the two escapees.

[8]McKay had been released on parole in November 1972.

[9]The only reasons stated by the review board were that full discussion of petitioner's case had already been had at the 1972 en banc hearing and that, "no reason to advance parole date" otherwise appeared.

[10]The present petition was filed following denial of writs of habeas corpus in the Superior Court of San Bernardino County (Feb. 6, 1973) and the Court of Appeal, Fourth District, Division Two (Feb. 28, 1973).

tioner has been released on parole. Accordingly, we must first consider whether the present matter has been rendered moot. Although petitioner and the Authority offer conflicting views as to the continued existence of a genuine controversy, this court may entertain the petition notwithstanding that the petitioner is now on parole. Petitioner remains within the constructive control of the Authority even though he has been released from actual physical custody. He therefore may properly apply for habeas corpus relief. (*In re Jones* (1962) 57 Cal.2d 860, 861 fn. 1 [22 Cal.Rptr. 478, 372 P.2d 310] [unanimous ruling that petition for habeas corpus was not rendered moot by parole of inmate following filing of the petition]; see also *Jones* v. *Cunningham* (1963) 371 U.S. 236 [9 L.Ed.2d 285, 83 S.Ct. 373, 92 A.L.R.2d 675]; cf. *In re Smiley* (1967) 66 Cal.2d 606 [58 Cal.Rptr. 579, 427 P.2d 179] [holding habeas corpus relief available to petitioner free on his own recognizance].)

In addressing ourselves to the merits of the petition we are confronted with the important question of what procedural due process is required in a parole release hearing. Petitioner argues that the minimum incidents of due process required for parole revocation hearings in *Morrissey* v. *Brewer* (1972) 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593] should also obtain in parole release hearings, particularly the requirement of a written statement by the parole board clearly articulating the specific reasons for its decision. He is joined by amicus curiae American Civil Liberties Union Foundation which urges that a written statement of reasons is necessary (1) to insure that the Authority relies on proper evidence, (2) to protect against arbitrariness by compelling the Authority to reason through its decision, and (3) to provide a proper basis for effective judicial review of Authority decisions. In answer, the Authority generally recognizes that parole release decisions must be made in a manner consonant with due process, but contends that the only process due is that applications for parole be rationally accepted and considered. In its view, due process is already satisfied by its current practice which provides for discussion of the reasons for parole denial by the correctional counselor and the inmate in a post-hearing interview.

The issue thus joined is precisely that anticipated by this court in *In re Prewitt* (1972) 8 Cal.3d 470 [105 Cal.Rptr. 318, 503 P.2d 1326]. In the course of deciding what due process requirements governed the rescission of an unexecuted grant of parole in that case, we observed: "Although for purposes of applying *Morrissey* we do not distinguish between a revocation and a rescission of a grant of parole, it is not our intent and we do not hold that the *Morrissey* procedures are applicable to proceedings by the Authority for fixing the terms of and granting paroles to prison inmates. We are nevertheless constrained to remark, although the issue is

not now before us, that certain proceedings in connection with the fixing of terms and granting of paroles may not now conform to due process requirements. When determining whether a procedure involved in the term-fixing or parole-granting process violates due process, 'the reviewing court must consider the objectives sought to be achieved by the challenged procedure, the possible unfairness to the prisoner, and the availability of alternative procedures which are less burdensome to the prisoner.' " (*Id.* at p. 475.)

Although petitioner invites reconsideration of the proposition that not all *Morrissey* procedures are applicable to parole release hearings, there are valid reasons for a distinction between revocation and release. In *Morrissey* the court recognized that revocation of parole involves the loss of a parolee's conditional liberty, whereas parole release decisions concern an inmate's mere anticipation or hope of freedom (408 U.S. at p. 482 & fn. 8 [33 L.Ed.2d 494-495]). Furthermore, a parole release proceeding is an attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts; in contrast, a revocation hearing involves a specific charge of out-of-prison misconduct which commends itself to quasi-judicial resolution. (Compare *Menechino* v. *Oswald* (2d Cir. 1970) 430 F.2d 403, at pp. 407-408 with *United States ex rel. Bey* v. *Connecticut State Bd. of Par.* (2d Cir. 1971) 443 F.2d 1079, 1086-1087.) We decline, accordingly to hold *Morrissey* directly applicable and instead adhere to a case by case determination of whether a particular incident of due process is required for parole decisions under the test we designated in *Prewitt*. (Accord, *Hannah* v. *Larche* (1960) 363 U.S. 420, 442 [4 L.Ed.2d 1307, 1321, 80 S.Ct. 1502]; *In re Minnis* (1972) 7 Cal.3d 639 [102 Cal.Rptr. 749, 498 P.2d 997]; see also, Parsons-Lewis, *Due Process in Parole-Release Decisions* (1972) 60 Cal.L.Rev. 1518, 1546-1549.)

Applying the foregoing criteria to the instant case we proceed to first identify the governmental objective sought to be furthered by rendering parole release decisions without making the reasons therefor available to the inmate in writing. Although the Authority has not advised us, we presume that one major objective served by nondisclosure is to facilitate the efficient and prompt hearing of a tremendous number of parole applications. During a single year as many as 21,000 applications may require the Authority's consideration. (See Cal Criminal Law Practice, *supra,* at p. 573.) Certainly, the expeditious processing of all these applications is aided by the Authority's current freedom from the obligation to draft formal statements of disposition. Another purpose seems to be to promote each panel's full examination of every possible factor without risk of psychologi-

cal harm to the inmate. The Authority considers the Form 279 to be in the same class as medical and psychiatric records (Dept. of Corrections, Memorandum Re: Form 279 (Sept. 28, 1971)) which are apparently withheld from the inmate in part because disclosure might adversely affect his rehabilitation or be harmful to his family relationships. (See *Administrative Sentencing, supra,* at pp. 373, 381, referring to testimony of Chairman Kerr before congressional committees.)[11]

Having these presumed purposes in mind we consider next whether any unfairness to the inmate is evident in the present system of rendering parole decisions. In turning to that issue we are met squarely with the argument that the absence of written reasons is unfair because, inter alia, it prejudices the inmate's ability to secure judicial relief from arbitrary Authority action. This contention draws upon a familiar principle of administrative law calling for findings to memorialize formal administrative agency decisions arrived at through adversary-type hearings. In those instances where the principle is applicable findings are deemed indispensable, first as an aid in apprising litigants of the agency's reasons so that they may decide whether to seek review and, second, as a basis for the review. (*Swars* v. *Council of City of Vallejo* (1949) 33 Cal.2d 867 [206 P.2d 355] [holding city civil service commissions' findings adequate to afford city employees proper review].) The failure to make findings following formal administrative adjudication is fundamentally unfair because an already recognized right of access to a reviewing court is impaired thereby. (*Mahoney* v. *San Francisco City etc. Employees' Ret. Bd.* (1973) 30 Cal.App.3d 1 [106 Cal.Rptr. 94].) However, that principle has not been extensively applied to more informal agency proceedings such as those of parole boards.[12] (See, Davis, Administrative Law Treatise (1970 Supp.) § 16.00, p. 559.) Consequently, the mere reference to the principle without further inquiry as to why it should be extended to informal determinations furnishes no cogent rationale for concluding that a written statement of reasons is required in support of parole denial decisions in the instant case.

We perceive petitioner's claim of unfairness to present two distinct issues:

[11]The only reason suggested for releasing information indirectly through a correctional interview appears in a Department of Corrections policy statement that, "Many of these notes are brief and in telegraphic style and therefore require staff interpretation which a trained correctional counselor should be able to provide." (Dept. of Corrections, Memorandum Re: Form 279 (Sept. 28, 1971).)

[12]Although characterized by this court as an administrative body since inception (see *In re Lee* (1918) 177 Cal. 690 [171 P. 958]), the Authority acts in a manner that is clearly informal and nonadjudicatory (cf. *In re Sandel* (1966) 64 Cal.2d 412 [50 Cal.Rptr. 462, 412 P.2d 806], holding that the Authority could not perform the judicial function of correcting an erroneous sentence).

first, whether there exists a right to relief which depends upon reasons being given for discretionary parole decisions and second, if so, whether the present system of post-hearing interviews is a procedurally sufficient assurance of that right.

In turning to the first of the two issues we note that relief following a final denial by the Authority of an application for parole, if such relief is available at all, must be judicial in nature. (See *In re Tucker* (1971) 5 Cal.3d 171, 179 [95 Cal.Rptr. 761, 486 P.2d 657].) This court, however, has seldom had occasion to review parole release hearings. Although it has long been recognized that the Authority must exercise its discretion in good faith, neither arbitrarily nor capriciously (see *Roberts* v. *Duffy* (1914) 167 Cal. 629, 640 [140 P. 260] [noting that the board's discretion must be exercised to reach a "fair and just conclusion"]), it is only recently that we have attempted to identify with specificity what the general requirement entails. Beginning with *In re Schoengarth* (1967) 66 Cal.2d 295 [57 Cal.Rptr. 600, 425 P.2d 200], we recognized that a prisoner not only has a right to apply for parole, but is entitled to have his application "duly considered." We further held in that case that due consideration means an examination of the inmate's institutional conduct, the nature of his offense, his age, his prior associations, his habits, inclinations and traits of character, the probability of his reformation, and the interest of public security. In the case of *In re Minnis, supra,* 7 Cal.3d 639 we held that "due consideration" also necessarily entailed a periodic reconsideration of parole potential, stating that an Authority policy automatically rejecting applications from inmates who had been convicted of selling narcotics had unfairly reduced the release proceeding to a pro forma denial. More recently, in the case of *In re Prewitt, supra,* 8 Cal.3d 470, we relied on *Minnis* in holding that inmates about to appear at a proceeding for rescission of an unexecuted grant of parole were entitled to copies of statements submitted for consideration under section 1203.01 in order that they could have a reasonable opportunity to respond to them.

This body of recent decisions evinces a limited cognizance of rights of parole applicants to be free from an arbitrary parole decision, to secure information necessary to prepare for interviews with the Authority, and to something more than mere pro forma consideration. Under time-honored principles of the common law, these incidents of the parole applicant's right to "due consideration" cannot exist in any practical sense unless there also exists a remedy against their abrogation. (See *Marbury* v. *Madison* (1803) 5 U.S. (1 Cranch) 137, 161-163 [2 L.Ed. 60, 68-69].) Hence, our prior recognition of a right to due consideration of parole applications necessarily gives rise to a concomitant right to an available

remedy. It follows that the fundamental question whether a statement of reasons is required as a matter of fairness must be answered in the affirmative if such a statement is indispensable to an effective remedy against infringement upon the right to due consideration.

The basic remedy available to correct arbitrary Authority action is the writ of habeas corpus. (See *In re Tucker, supra,* 5 Cal.3d 171.) A plea for such relief, however, will not receive judicial consideration unless the petitioner alleges with particularity the circumstances constituting the People's claimed wrongful conduct and demonstrates how he is prejudiced thereby. (*In re Swain* (1949) 34 Cal.2d 300 [209 P.2d 793].) It is unlikely that an inmate seeking to establish that his application for parole was arbitrarily denied can make necessary allegations with the requisite specificity unless he has some knowledge of the reasons therefor.

The United States Supreme Court in considering the validity of an informal denial of reformative as distinguished from criminal treatment in the case of a juvenile accused of an offense, has held inter alia that a statement of reasons for the denial is indispensable to a due process review thereof. (*Kent* v. *United States* (1966) 383 U.S. 541 [16 L.Ed.2d 84, 86 S.Ct. 1045].) In *Kent* a juvenile aged 16 was arrested for a robbery and rape. He was tried in the District Court for the District of Columbia after a juvenile court summarily entered an order waiving its exclusive jurisdiction, thereby withdrawing from him the advantages of an informal trial and reformative sentencing as a juvenile. The order merely recited that jurisdiction was waived after the "full investigation" required by statute. Recognizing that the juvenile court was vested with broad discretion, the high court nevertheless held that fairness, as well as compliance with the statutory requirement of "full investigation," precluded the exercise of that discretion in an arbitrary manner. In the court's view, an informal decision of such importance could not be reached without a statement of reasons to the juvenile as to why special rehabilitative treatment was being withdrawn. Not only was a statement of reasons deemed necessary to make possible meaningful judicial review, but it was also deemed desirable as an assurance that the jurisdictional question would receive "the careful consideration" of the juvenile court in the first instance. (*Id.* at p. 561 [16 L.Ed.2d at p. 97].)[13]

---

[13]Although the disposition in *Kent* was heavily grounded upon a statute applicable to the District of Columbia, as well as considerations of fairness, we have since recognized that the decision is of constitutional dimensions insofar as it dealt with the juvenile's right to counsel. (*In re Harris* (1967) 67 Cal.2d 876, 878-879 [64 Cal.Rptr. 319, 434 P.2d 615].) The decision has been recognized to have a further, equally strong constitutional basis for requiring a statement of reasons. (See *Powell*

It is contended that the availability of an effective remedy, required by our previous recognition of a right to "due consideration" of a parole application, necessarily depends upon the use of a statement of reasons in three important respects. First, there is little inherent guard against careless decisions in the absence of a statement of reasons, especially in view of the Authority's tremendous caseload. (*Kent* v. *United States, supra,* 383 U.S. 541, 561 [16 L.Ed.2d 84, 97]; *California Motor Transport Co.* v. *Public Utilities Com.* (1963) 59 Cal.2d 270, 274-275 [28 Cal.Rptr. 868, 379 P.2d 324].) Second, inmates may be denied the opportunity to formulate a persuasive application for relief if they are unaware of the reasons why parole was denied. (See *In re Swain, supra,* 34 Cal.2d 300.) Finally, courts may find review impossible without ordering an evidentiary hearing if the record of the action taken by the Authority is inadequate. In light of *Kent,* the mere recognition of these considerations leads inexorably to the conclusion that due process requires that the Authority support its determinations with a statement of its reasons therefor.[14]

■ We now consider the second issue of petitioner's claim of fundamental unfairness. In its returns the Authority does not flatly dispute that due consideration may require some communication of reasons to the prisoner, but instead contends that the present system of post-hearing interviews with a correctional counselor is sufficient to inform the prisoner, allow for review, and guard against arbitrary decision.

While the Authority's argument is not entirely without merit, the record in this very case belies its assertion. It is readily apparent that petitioner remained almost entirely uninformed of the Authority's reasons for each

v. *Hocker* (9th Cir. 1971) 453 F.2d 652, 654 [holding that *Kent* establishes, inter alia, a juvenile's right under the Fourteenth Amendment's due process clause to a statement of reasons why he will be tried as an adult].) Hence, *Kent* stands for the proposition that fairness requires a statement of reasons as a guard against the arbitrary exercise of certain kinds of informal power.

[14]Developing authority in other jurisdictions also recognizes that a prisoner's interest in a fair parole decision merits the protection of a statement of reasons. In *Monks* v. *N.J. State Parole Board* (1971) 58 N.J. 238 [277 A.2d 193], the Supreme Court of New Jersey held that reasons must accompany a parole denial to insure a "responsible and just determination" and "a proper basis for effective judicial review." Similarly, several federal courts have recently held that the United States Board of Parole must state to the prisoner its reasons for denying parole. In *United States* ex rel. *Harrison* v. *Pace* (E.D.Pa. 1973) 357 F.Supp. 354, the court held that a prisoner was entitled to a statement of reasons for parole denial so that he could "appropriately adjust his future conduct." In addition to so considering the positive effect which reasons could have on the goal of rehabilitation, the court also relied on the rationale of *Monks* that reasons were necessary for effective review and the assurance of a "responsible and just determination." (See also *United States* ex rel. *Johnson* v. *Chairman, N.Y. St. Bd. of Par.* (E.D.N.Y. 1973) 363 F.Supp. 416; *Childs* v. *United States Parole Board* (D.D.C. 1973) 371 F.Supp. 1246.)

of the denials notwithstanding that he engaged in post-hearing discussions with a correctional counselor. In his 1971 letter to the Authority's chairman, petitioner flatly states that he was unable to secure the reasons for parole denial from correctional counselors. The assertion to the chairman seems corroborated by the uninformative content of the Form 279 in each case of denial. As noted above, over the decade prior to 1970 these records are devoid of a definitive statement of reasons for the action taken by the Authority. In fact, the "comments" sections, where reasons would be expected to appear, on all but three of the forms are either entirely blank or bear extraordinarily vague notations such as, "time only factor now" or "must develop self." Other comments state either that petitioner was advised to further his vocational training or to further adjust to a lower custody status. In general the forms merely recount what petitioner said or believed, state what facts, section 1203.01 letters, and other information was at the disposal of the panel, and list the final result of the hearing. The forms for the past three years are only slightly more enlightening: in 1970, the Authority's few comments indicate "seriousness of offense discussed"; in 1971, there are brief notations to the effect that petitioner had fulfilled his trade and educational goals, that the crime was an "execution" of officers, and that petitioner had been identified as the leader; and in 1972, the form merely recites in cryptic manner the basic facts of petitioner's offense and institutional history. Even more cryptic is the divided review board's affirmance of the 1972 denial which states as its reason, "no reason to advance parole date." The Authority chairman's response to petitioner's polite letter seeking reasons solely for the laudable purpose of reforming his conduct, is equivocal, avoiding any genuine indication of the reason for denial in petitioner's particular case by speaking only in general terms of the various interests usually considered in parole decisions. Indeed, it was only after counsel was retained that the Authority, upon en banc reconsideration of petitioner's case, finally articulated on a Form 279 that the "key factor standing in the way of parole appeared to be a consensus that Sturm had been leader and more sophisticated of the two offenders."[15]

[15]The records thus evince a pattern consistent with that described in a recent Department of Corrections survey: "A review of the comments made by the counselor and Adult Authority found in the Central File Jacket shows that the record of most hearings is scant and somewhat illegible. Later, the inmate is officially informed as to the decision reached by the Adult Authority. If paroled, he is happy and usually does not question why. If denied the inmate usually wants to know two things: a) why was he denied? and b) what kind of a record does the board want him to bring to it for parole consideration next year? The inmate's counselor goes to the Central File Jacket if he attempts to answer these questions posed by the denied inmate. He finds the somewhat illegible information to be scant and cannot answer the inmate's questions." (California Department of Corrections, Preliminary Adult Authority Proposal (Bay Area Research Unit), p. 2.)

It would seem, therefore, that the reliance on oral communication leaves articulation of reasons only to the rare correctional officer who may be able to telepathically discern the Authority's unrecorded rationale for unfavorable action. In addition to failing to adequately inform the inmate, the present record also evinces a pattern of decision-making highly unlikely to afford an adequate basis for judicial review. The Authority's present practice is hardly consonant with a mandate that a basis for administrative action must be set forth with sufficient clarity as to be understandable. (See *Securities Comm'n* v. *Chenery Corp.* (1947) 332 U.S. 194, 196-197 [91 L.Ed. 1995, 1999, 67 S.Ct. 1575].) The precise reason for agency action remains open to judicial construction by the very kind of conjecture which review should avoid. (Cf. *Conti* v. *Board of Civil Service Commissioners* (1969) 1 Cal.3d 351 [82 Cal.Rptr. 337, 461 P.2d 617].)

An additional factor which must be weighed in the balance in determining whether due process compels a particular administrative procedure, is the consequences to the administrative machinery in requiring that the challenged procedure be implemented. (*In re Tucker* (1971) 5 Cal.3d 171, 179-180 [95 Cal.Rptr. 761, 486 P.2d 657].) There is little included in the returns bearing upon this question. However, the very nature of a written statement suggests that the major impact on the Authority will be a need for more time per hearing to allow for delineation of the reasons and perhaps additional clerical manpower to prepare the statements. Neither of these demands seems prohibitive,[16] and they would be counterbalanced by the lesser burden of preparing for and conducting special post-hearing interviews to explain the parole decision.

We conclude, accordingly, that in the absence of a definitive written statement of its reasons for denying parole at a regularly scheduled parole hearing, the Authority effectively deprives the inmate of procedural due process of law.

The detailed consideration of petitioner's foregoing contentions not only serves to resolve matters at issue herein, but also to enunciate rules which may again be applicable herein and, most certainly, in future parole hearings in other cases. Petitioner makes additional contentions which chal-

---

[16]Management analysts and planning officers of the Youth Authority and Department of Corrections have estimated that an average of only three additional minutes per case would be required if dictation equipment were used and that dictated decisions could be transcribed within approximately four minutes by the institution stenographers who already handle institutional clerical work. (Youth and Adult Corrections Agency, The Paroling Boards of the Agency: An Administrative Analysis at pp. 136-137 (December 1962).)

lenge the propriety of Authority conduct in denying applications prior to his release on parole after the commencement of this proceeding. Such additional contentions, in our judgment, are now irrelevant to petitioner's current status and a discussion of them would afford no enlightenment on future parole hearings. We need not, accordingly, reach the issues therein raised.

As no relief is sought in connection with petitioner's current status as a parolee the writ need not issue. The Authority will be required, nevertheless, commencing with the finality of this opinion, to support all its denials of parole with a written, definitive statement of its reasons therefor and to communicate such statement to the inmate concerned.[17]

The order to show cause is discharged and the petition for the writ of habeas corpus is denied.

McComb, J., Tobriner, J., Mosk, J., Burke, J., Sullivan, J., and Clark, J., concurred.

[17]Since oral argument we have been informally advised that the Authority has already commenced to develop a system of written communication of reasons to the inmate. It is anticipated, of course, that the Authority will undertake to conform its efforts to the views expressed herein.