[No. A067484. First Dist., Div. Four. May 30, 1995.]

In re CHESTER JOHNSON on Habeas Corpus.

162

**COUNSEL**

Donald Specter, Steven Fama and Alison Hardy for Petitioner.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Kenneth C. Young, Assistant Attorney General, Peter J. Siggins and William Jenkins, Deputy Attorneys General, for Respondent.

**OPINION**

**POCHÉ, J.**—In this habeas corpus proceeding we review a decision of the Board of Prison Terms rescinding a life prisoner's parole.

## I. BACKGROUND

### A.

Petitioner Chester Johnson was convicted of the first degree murders of Loren Silliphant and Dr. Glen Olsen in 1970 and was sentenced to death. The sentence was later modified to life imprisonment.

Those familiar with Johnson's first appearance before this court (*In re Johnson* (1992) 8 Cal.App.4th 618 [10 Cal.Rptr.2d 460]) know the early procedural history. On December 3, 1981, the Board of Prison Terms[1] conducted a parole consideration hearing, found Johnson suitable for parole,[2] and set a parole release date of October 17, 1994. Subsequent progress hearings advanced the release date to October 17, 1991. (*In re Johnson, supra,* 8 Cal.App.4th at p. 621.)

By letter dated August 4, 1991, by which he purported to act pursuant to Penal Code section 3041.1,[3] the Governor requested the Board to review its decision en banc. The Governor expressed two concerns underlying his request: (1) public safety; and (2) the gravity of the commitment offenses.

On August 13, 1991, the Board, sitting en banc, and "[p]ursuant to § 3041.1" reviewed the earlier grant of parole. A majority of the Board "determined" that the grant of parole and current release dates "may not be appropriate and, accordingly, improvident (Title 15, California Code of Regulations, § 2451(c))." The Board ordered a rescission hearing "to determine whether the inmate would pose an unreasonable risk to public safety if released to parole."

---

[1]The Board of Prison Terms and its predecessors in interest, the Adult Authority and the Community Release Board, are collectively referred to as the Board in this opinion. The terms "panel" and "Board" are used interchangeably throughout this opinion.

[2]The granting majority reasoned: "Although the commitment offenses were senseless acts and the panel is aware of the seriousness, when viewed in relation to prisoner's apparent maturation; expressions of remorse; overall positive institutional adjustment; development of marketable skills; supportive Psychiatric Reports; and family support, panel finds that prisoner has demonstrated an ability to function within the law upon release."

[3]Penal Code section 3041.1 provides: "Up to 90 days prior to a scheduled parole release date, the Governor shall have the power to request review of any decision concerning the grant or denial of parole to any prisoner in a state prison. The Governor shall state the reason or reasons for the request, and whether the request is based on a public safety concern, a concern that the gravity of current or past convicted offenses may have been given inadequate consideration, or on other factors. When a request has been made, the full board, sitting en banc, shall review the parole decision. In case of a review, a vote in favor of parole by a majority of the current board members shall be required to grant parole to any prisoner. In carrying out any review, the board shall comply with the provisions of this chapter."

Unless otherwise indicated all further subsequent statutory references are to the Penal Code.

The Board gave four reasons for its decision to order a parole rescission hearing: (1) a clinical evaluation of Johnson in September of 1981 had concluded that Johnson's potential for violence on parole was unpredictable; (2) the Board's concern that Johnson "may not, at the time of being granted parole, have understood the nature of his crime"; (3) a prison disciplinary action in September of 1980 for possession of contraband (money); and (4) the "concerns" expressed by the Governor in his letter requesting en banc review (which the Board adopted and incorporated by reference). The rescission hearing was held November 20, 1991. (*In re Johnson, supra,* 8 Cal.App.4th at pp. 621-622.)

After his administrative appeals were denied, Johnson petitioned for a writ of habeas corpus challenging the Board's decision to hold him beyond his scheduled release date. As a consequence of that petition the superior court ordered Johnson released on parole on November 2, 1991. The superior court concluded that the Governor's request for en banc review had been untimely under section 3041.1, and that the record did not support rescission of Johnson's parole. (*In re Johnson, supra,* 8 Cal.App.4th at pp. 622-623.) On an appeal by the Board, we reversed. (At p. 627.)

Although we agreed with the superior court that the Governor's request had been untimely, we rejected the notion that this untimeliness deprived the Board of its inherent power to reconsider its grant of parole to Johnson. (*In re Johnson, supra,* 8 Cal.App.4th at pp. 623-624.) We also held that the superior court had acted prematurely in deciding there was insufficient evidence in the record to support rescission: "If, as and when the Board rescinds parole, that determination will be subject to judicial review." (At p. 625.) Finally, we rejected Johnson's argument that it would be unfair to return him to prison pending the outcome of the rescission hearing. (At pp. 626-627.)

Johnson was returned to prison on November 23, 1992.

### B.

On December 11, 1992, the Board formally notified Johnson that a rescission hearing would take place on January 14, 1993.[4] The stated reason for the rescission hearing was his return to custody following the finality of our opinion.

The notice advised Johnson that he could request the attendance of witnesses "who have given information against you and persons who have

---

[4] Johnson waived his right to a prerescission hearing.

information that might help you." On the section of the form entitled, "Request for Witnesses" Johnson responded that he would "submit a list of approximately twenty (20) witnesses." In fact, Johnson submitted a list of 35 witnesses including Department of Corrections (CDC) employees, family members, and community friends. The CDC employees were to testify regarding Johnson's in prison activities, his character, work habits and "other matters related to . . . suitability for release"; the family and community members were to testify regarding Johnson's character and his activities during the 13-month period he was released on parole. The Board responded in writing that although Johnson had the right to "request" witnesses at the rescission hearing, he had no right "to the attendance of" those witnesses. The Board advised Johnson his request to present witnesses would be formally ruled upon at the rescission hearing.

## C.

Johnson made a number of objections at the commencement of the rescission hearing, including one to the Board's refusal to allow him to present witnesses.[5] In rejecting that objection the Board stated "this panel is considering this as a fact-finding phase of the hearing related to written evidence, and the record that was considered . . . by the 1981 hearing panel that granted parole."

Each of the four bases cited by the Board sitting en banc was reviewed by the Board in the instant proceeding. The Board dismissed the second and third, but found that the first and fourth (the clinical evaluation in 1980 and the reasons stated in the Governor's letter) provided good cause to rescind Johnson's parole. Its "Reasons For Decision" concluded: "Based on the evidence presented in writing and verbally, the January 14, 1993, hearing panel finds that the 1981 hearing [panel] committed errors by not giving adequate consideration to all the relevant information. [¶] This panel finds that the 1981 panel gave an improvident grant by not giving adequate weight to all the available issues."

The Board spelled out its reasoning: in finding that the granting panel of August 20, 1981, had failed to give appropriate weight to the clinical evaluation authored by Gideon E. Jean-Jacques, the Board first paraphrased those portions of the Jean-Jacques report it found important:

"Personality Description Axis 1 304 dependence on a consideration of opioid and non-alcoholic substance (heroin, marijuana, amphetamines, LSD) Axis II 301.70 Anti-Social Personality Disorder.

---

[5]Johnson did not object to the form of the notice he received.

"Clinical Conclusion: Diagnosed psychopathology appears directly related to the offense and general behavior pattern. He appears to have matured considerably with acquisition of intellectual insight and behavioral controls. It is not known to what extent these qualities would hold in a free community. Violence potential while in the free community is estimated to have been exceedingly greater than the average man on the street, especially when under the influence of intoxicants. It is presently estimated to be unpredictable. Conditions of parole should include no alcohol, drug surveillance, clinic parole outpatient clinic, including family counseling and close supervision."

The Board then commented: "Psychiatric Council on September 1981 concurred with the report. [¶] The 1980 Psychological Evaluation Diagnosis was [p]ersonality disorder, passive aggressive personality and states prisoner psychiatrically has improved moderately. Again, this evaluation shows concern, recommending the prisoner's parole conditions should include outpatient clinic supervision. The August 1979 psychological report by C. A. Wilkins and R. B. Dainard diagnosis was personality disorder, passive aggressive personality. The panel who conducted the progress hearing dated January 14, 1988, saw a need for an indep[th] [p]sychiatric evaluation and ordered a Category X. [¶] Category X dated June 1990 authored by Ranald Bruce, Staff Psychologist, is extremely negative. It states the prisoner is opinionated and intolerant of others. He speaks directly and bluntly even if it angers others. He is intensely competitive, hardheaded and unsympathetic."[6]

The Board continued: "These descriptions reflect strong, narcissistic and anti-social trends which predominates [sic] this prisoner's personality. He depends only on himself, often distrusts and keeps his distance from others and can appear egotistic and pretentious. Mr. Johnson sees the world and situations in his own unique way which may be quite different from the consensus of others. He functions moderately well in structured situations but experiences much stress in unstructured settings. He lacks well developed ego strengths or coping abilities. Prisoner's personality is primarily narcissistic and assertively independent in its orientation. The Category X report further warns the Board, as did other [p]sychiatric reports attempt to warn the Board of the prisoner's [propensity] to drug and alcohol abuse. The report states the test results indicate he has an exceptionally strong characterological predisposition to abuse alcohol. His history of heroin and alcohol abuse prior to the instan[t] offense supports this. [¶] During discussion with the prisoner, he denied having a drug or alcohol problem and stated he only participated in drug therapy or [Alcoholics] Anonymous or Narcotics Anonymous a couple of times or several times or maybe eight or nine times prior to 1981."

---

[6] A category X is a 90-day psychiatric or psychological assessment. (Cal. Dept. of Corrections, Operations Manual, § 62080.11.)

Good cause to rescind was also found on the fourth basis: the "concerns" noted in the Governor's letter requesting an en banc hearing which were divided into two categories: (1) "Public Safety," and (2) "Gravity of Commitment Offenses."

With respect to public safety, the Board addressed each of the categories listed in the Governor's letter:

"(1) Nature and Circumstances-Commitment offenses involved multiple victims in separate inciden[ces] of violence. The crimes were atrocious and heinous. The prisoner still denies being directly responsible for the shooting death of Dr. Olsen, claiming the offense was committed by his crime partner. While he accepts responsibility for most of the crimes indicated on this document, he denied that his conduct in Michigan following his arrest was violent. He indicated that he was advised by an attorney to lie to a judge about his intention to kill another individual so he could stay in Michigan and avoid the death penalty in California. Additionally, he claimed he had a makeshift knife in his possession again to avoid extradition. The prisoner could not remember threatening the life of the investigating officer. [¶] (2) Again, prisoner admits to the crimes with the exception of being the shooter in the killing of Doctor Olsen. He denies that he was still plotting to commit murder after his arrest but was lying about that issue to avoid extradition. In the above discussed issues . . . the prisoner admitted lying for the reasons discussed. His lack of veracity in his communications with a judge in Michigan to avoid [j]ustice in California questions his truthfulness in other matters. The panel has grave concerns about his honesty and truthfulness. [¶] (3) The prisoner readily admits to past criminal and behavioral history at an early age. [¶] (4) The prisoner has expressed remorse prior to the granting of parole as indicated in document[s], i.e., board reports and psychological evaluations. He accepts responsibility for both murders but denies actually shooting Dr. Olsen. [¶] (5) Past and present mental state—see # 1."

Turning to the second category of the Governor's letter—The Gravity of the Commitment Offenses—the Board commented: "The 1981 parole granting panel failed to discuss the crimes that occurred in this case. The number and nature of the atrocious crimes deserved an indepth inquiry to determine the prisoner's attitude about the serious crimes at the time of commitment and at [the] time of the 1981 parole hearing. The 1981 hearing transcript was reviewed and it was void of [any] significant reference to the criminal acts by the prisoner. It is concluded that the gravity of the brutal crimes were [sic] inadequately considered by the 1981 Board of Prison Terms . . . granting panel."

## II. Review

### A. *Cause to Rescind.*

■  The Board found two reasons for rescinding Johnson's parole release date: (1) the granting panel in 1981 had failed to give adequate weight to the clinical evaluation report by Jean-Jacques which indicated to the Board that Johnson's release would pose a danger to public safety; and (2) the granting panel had "inadequately considered" the gravity of the "brutal crimes" that Johnson had committed.

Johnson argues that neither of these reasons is contained within the definition of cause.

It is clear from statutory law that to rescind an unexecuted grant of parole the Board must have "cause." (§ 3063.) The measurements of "cause," however, are not as precise as is the necessity of its presence. We held in *In re Fain* (1976) 65 Cal.App.3d 376 [135 Cal.Rptr. 543], that the definition of cause for rescission is not restricted to the matters enumerated in the Board's regulation set forth in section 2451 of title 15 of the California Code of Regulations.[7] (65 Cal.App.3d at pp. 393-394.) Because the Board's discretion in parole matters is " 'great,' 'absolute' and 'almost unlimited,' " we found the term "cause" sufficiently broad to include matters such as a determination by the Board that parole was improvidently granted under the circumstances which appeared at the time of the initial grant of parole or later (At p. 394).

In the case at hand each of the reasons set forth by the Board fits comfortably within the "concerns" set forth in section 3041.1. (See fn. 3, *ante*, p. 163.) To recite the obvious, section 3041.1 empowers the Governor—if he or she acts within the time limits set forth therein—to require the Board to review a parole decision. In doing so the Legislature requires the Governor not only to "state the reason or reasons for the request" but also to state "whether the request is based on a public safety concern, *a concern that the gravity of current or past convicted offenses may have been given inadequate consideration, or on other factors.*" (Italics added.) Although section

---

[7]Section 2451 of title 15 of the California Code of Regulations provides in relevant part: "Department staff shall report to the board . . . conduct which may result in rescission proceedings. The board shall determine whether to initiate rescission proceedings. Examples of conduct which must be reported to the board include: [¶] (a) Disciplinary conduct. [¶] [¶] (b) Psychiatric Deterioration. [¶] . . . [¶] (c) Other. Any new information which indicates that parole should not occur. Examples include: an inability to meet a special condition of parole, such as failure of another state to approve an interstate parole; information significant to the original grant of parole was fraudulently withheld from the board; or fundamental errors occurred resulting in the improvident granting of a parole date."

3041.1 does not confer any power on the Board (see *In re Johnson, supra*, 8 Cal.App.4th at pp. 623-625), it acts to give meaning to and therefore to codify at least a portion of the Board's existing inherent power to rescind an unexecuted grant of parole for cause. Specifically as a result of the language of section 3041.1 there can be no doubt that the Board may find cause to rescind parole on the basis of a public safety concern and on the basis that the gravity of the prisoner's current or past convictions may have been given inadequate consideration. That, of course, is precisely what the Board did in this case and in doing so employed language very close to the statutory language.

To read the statute otherwise would be to posit that the Legislature meant section 3041.1 only as an exercise in penmanship for Governors, as requiring the chief executive of the state to set forth concerns (e.g. for public safety) that would be beyond the power of the Board to consider or act upon. We do not so read the statute. We find that each basis given by the Board for revoking Johnson's parole falls within the definition of "cause."

The remaining question is the adequacy of the factual underpinning for the Board's determination of cause. Johnson contends that there was "no real evidence" on which the Board could base its decision to rescind. Judicial review of the decision to rescind parole is limited to determining whether there is "some evidence" to support the Board's decision. This was made clear by our Supreme Court in *In re Powell* (1988) 45 Cal.3d 894 [248 Cal.Rptr. 431, 755 P.2d 881]: "A parole date, like a good time credit, is a prospective benefit that is conditioned on the inmate's continued good performance and subject to review and withdrawal for cause by the [Board]. While the board cannot rescind a parole date arbitrarily or capriciously, it does not abuse its discretion when it has some basis in fact for its decision. . . . [T]he [Board] must strike 'a balance between the interests of the inmate and of the public.' [Citation.] If it is to accomplish this delicate task, it must operate with broad discretion and not be 'subject to second-guessing upon review.' [Citation.] Accordingly, we hold that due process requires only that there be *some evidence* to support a rescission of parole by the [Board]." (*Id.* at p. 904, italics added.)

Reasonable minds could differ as to whether the granting panel of the Board in 1981 gave adequate consideration to the gravity of Johnson's offenses. Reasonable minds could also differ as to whether Johnson's release would pose a danger to public safety and as to whether in that regard adequate consideration was given to the clinical evaluation report by Jean-Jacques. Because the Board's discretion in parole matters is " 'great,' 'absolute,' and 'almost unlimited' " (*In re Fain, supra*, 65 Cal.App.3d at p. 394), it is certainly broad enough to permit the Board to make the findings herein.

For these reasons, we find that the Board's decision to revoke Johnson's parole is supported by some evidence and hence does not constitute a denial of due process within the meaning of *In re Powell, supra,* 45 Cal.3d 894.[8]

## B.  *Denial of Request to Present Witnesses.*

■  Johnson contends that the Board violated its own procedural rules as well as general principles of due process when it ruled that he could not present any witnesses at his rescission hearing. We agree.

Although the Board has broad discretion in parole matters, that discretion is subject to the prisoner's right to procedural due process. (*In re Prewitt* (1972) 8 Cal.3d 470, 474 [105 Cal.Rptr. 318, 503 P.2d 1326]; accord, *In re Powell, supra,* 45 Cal.3d 894, 902; *In re Sturm* (1974) 11 Cal.3d 258, 272 [113 Cal.Rptr. 361, 521 P.2d 97]; *In re Clutchette* (1974) 39 Cal.App.3d 561, 564 [114 Cal.Rptr. 509].)

Both the Penal Code and the regulations implementing those provisions promulgated by the Board confer very specific procedural rights on the prisoner at the rescission hearing. (See, e.g., §§ 3041.5, 3041.7, 2932, subd. (c)(3).) Included is the right to request the presence of witnesses, friendly or adverse. (§ 3041.5; Cal. Code Regs., tit. 15, §§ 2465, 2668.) The prisoner's witnesses "shall" be called unless the Board "has specific reasons to deny this request" and advises the prisoner of those reasons in writing. (§ 2932, subd. (c)(3); see § 3041.5 [incorporating the rights afforded in § 2932, subds. (c) and (d), to parole rescission hearings].)

The Board's regulations specify that upon a timely receipt of a prisoner's request for friendly witnesses, Board staff may refuse to notify the witnesses only if the testimony is clearly irrelevant or cumulative. The staff is further directed, "If there is any question about the expected testimony, the staff may ask the prisoner . . . or his attorney to make a written statement, which summarizes the expected testimony and states how the testimony would be relevant or non-cumulative." (Cal. Code Regs., tit. 15, § 2668, subd. (b)(1).) In addition, "Great care must be taken in refusing to notify any witness who may be an adverse witness. Staff should be sure that the testimony of the witness is clearly irrelevant before refusing to call the witness." (Cal. Code Regs., tit. 15, § 2668, subd. (b)(2).)

Johnson requested 35 witnesses for purposes of testifying to his behavior in prison, his character and to his performance during his 13-month release

---

[8]To the extent Johnson argues that the Board "simply yielded to pressure from Governor Wilson," we reject the contention out of hand. The constitutional doctrine of separation of powers precludes this court from inquiring into the motivation or mental processes which may underlie the Board's action. (*In re Fain, supra,* 65 Cal.App.3d at p. 393, fn. 14.)

on parole. Under the authorities just discussed, the Board was required to call each of those witnesses unless it had a specific reason for not calling the witness and had explained that reason in writing to the prisoner. (§ 2932, subd. (c)(3).)

In its written response to Johnson's request for witnesses, the Board representative advised Johnson that although he was entitled to request witnesses, he had no right to call them. That response fell far short of satisfying the regulatory requirement that the prisoner be advised in writing of the specific reasons his witnesses would not be called at the rescission hearing. (§ 2932, subd. (c)(3).)

At the hearing, the Board formally denied Johnson's request for witnesses because in its words, its review was to be limited to the record of the 1981 granting hearing. However, the Board's written decision and the comments of the members during the hearing both clearly demonstrate that the Board considered a number of matters which did not exist at the time of the 1981 hearing. For example, the written decision indicates that the Board considered the following documentary evidence: the prisoner's file, all "Board Reports," all "Psychiatric Reports" (including the 1990 category X report by Ranald Bruce), "Hearing Decisions," "supportive letters," all "Parole Consideration Progress," and the Governor's letter.

In addition, during the hearing the Board made reference to information and evidence beyond that which was considered in 1981. For example, a number of times Board members referred to the 1990 category X evaluation or voiced concerns about whether Johnson had a present disposition to abuse alcohol which would affect his present potential for violence.

Thus, the sole reason the Board gave for denying Johnson's request to call witnesses was incorrect as a matter of fact: the Board did not confine its review to the four corners of the 1981 parole rescission hearing. But even if the Board had limited its review to the record of the 1981 hearing, Johnson should have been permitted to call witnesses whose testimony would have been relevant to understanding or interpreting that record, including the Jean-Jacques report the Board found so important.

It is compellingly obvious that the Board violated its own rules before the hearing when its staff summarily denied Johnson's request for witnesses without detailing in writing its reasons for doing so. It is equally plain that the Board itself violated its own rules at the hearing when it overruled Johnson's request on the basis that the Board was confining its review to the record of the 1981 hearing granting parole. In so ruling the Board also

violated the fundamental tenets of due process which apply to the rescission hearing. (*In re Prewitt, supra*, 8 Cal.3d 470, 476.)

We do not find this accumulation of error to be harmless beyond a reasonable doubt. (Cf. *In re Ruzicka* (1991) 230 Cal.App.3d 595, 601 [281 Cal.Rptr. 435] [applying *Chapman* test of error to due process violation at parole hearing].) Among the reasons for this finding is the nature of the excluded witnesses. For example one of Johnson's proffered witnesses was Ranald Bruce, the author of the June 1990 category X report which the Board cited and relied upon in support of its decision. Bruce had submitted a letter to the Board in support of Johnson's release,[9] but Johnson was not allowed to examine Bruce with respect to the 1990 report which the Board itself characterized as "extremely negative." The Board's refusal to allow Johnson to call him as a witness prevented Bruce from explaining to the

---

[9] In his letter to the Board, Bruce wrote: "I first met Mr. Johnson in the summer of 1990 when I wrote a Category X evaluation on him for the BPT. I believed then and I believe now that Mr. Johnson is ready for parole, can be successful on parole and can continue on to lead a peaceful, law abiding life. I believe he has demonstrated that by his successful completion of thirteen months of parole already, Chester has shown, and undoubtedly will continue to show, his complete and thorough determination to never reoffend. [¶] Nothing in this world counts as much as perseverance and determination. Most of the people I know, within prisons and outside are not born with the ideal personality, the perfect upbringing, the grace or position or education we might choose. But we struggle, we commit, we determine to rise above what life, through no fault of our own, has dealt us. And it is only through that determination that anyone ever rises above their circumstances. [¶] Some, like Chester, are dealt awful hands; abuse, neglect, rejection, lon[e]liness and out of that confusion and frustration they act in ways that bring them to prison, in ways even they cannot comprehend, in ways that they would change if only they could redo the past. But the only thing they can change is their own being, their own resolve to change entirely who and what they were when they came to prison. Chester has done this with every [resource] at his disposal, with everything he could muster. He has quite literally transformed the angry, rebellious youth of his teenage years into the mature, soft spoken, thoughtful and determined man you will see before you. In my ten years in the CDC I have rarely if ever met a man with more calm assurance and level-headedness than Chester. [¶] Even throughout the terrible events of the last two years, when something he had been working towards for twenty years was snatched away just as it seemed within his grasp, did I see Chester respond with anything but balance and deliberation. I wonder if many of us would have the inner resources to respond so well to this kind of setback. But this is not the first setback Chester has ever experienced nor will it be his last. What is certain though is that he will *always* respond with an even temper and an absolute commitment to never repeat the past. That is Chester. He is his determination. [¶] Certainly he has other traits, imperfections, flaws. We all do. They are documented within my Category X report. A psychological report has to be a balanced document detailing the positive and negative, the strengths and the weaknesses. But I suggest that traits like stubbornness, driveness, hard-headedness, even self-centeredness are exactly what Chester had to be to keep going, to keep persevering, to keep rebounding from every setback, every disappointment. And in this determination, practiced over and over to an extent incomprehensible to those who have had an easier life, Chester had irrevocably and forever changed himself. [¶] I fervently hope, wish and pray that you and the Board give Chester Johnson the chance he has earned and to which he has dedicated himself for the last twenty or more years of his life."

Board that it was perhaps misreading or misinterpreting the 1990 category X report it found to be so negative.

We find the appropriate remedy is to vacate the rescission order and to order the Board to conduct a new rescission hearing on the two bases it found persuasive. That hearing shall be conducted in accordance with due process and the Board's rules. (Cf. *In re Bowers* (1974) 40 Cal.App.3d 359, 362 [114 Cal.Rptr. 665]; accord, *In re Ruzicka, supra,* 230 Cal.App.3d at pp. 603-604.)[10]

## C.

Finally, Johnson contends that his reimprisonment after 13 months of release constitutes cruel or unusual punishment. (U.S. Const., 8th Amend; Cal. Const., art. I, § 17.) Johnson readily concedes that he can find no case supporting his claim, but argues that his "present incarceration is shocking and offensive to human dignity, and totally without any legitimate purpose."

Because his initial release was itself contrary to law there was no constitutional violation in his reimprisonment. The Board was entitled to conduct a formal rescission hearing prior to Johnson's release from prison, and would have done so had the superior court not intervened and released Johnson prior to the hearing.

The petition for writ of habeas corpus is granted. The Board is directed: (a) to vacate its decision rescinding Johnson's parole dates; (b) to schedule and commence a new rescission hearing within 30 days of the finality of this opinion; and (c) to conduct that rescission hearing in strict accordance with the views expressed herein.

Anderson, P. J., and Perley, J., concurred.

Petitioner's application for review by the Supreme Court was denied September 13, 1995.

---

[10]We of course cannot spell out which of Johnson's witnesses would present relevant testimony for the rescission hearing. The answer depends on the evidence the Board elects to review at the rescission hearing. If on remand the Board confines its review to the four corners of the 1981 parole hearing, then Johnson would be entitled to call those witnesses who can present testimony relevant to a reconsideration of the evidence presented at that hearing. If the Board considers matters that have occurred since the 1981 hearing, then the scope of relevant testimony would be considerably broadened.