Filed 4/7/14  In re Ferguson CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### COURT OF APPEAL - FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| In re KENNETH MICHAEL FERGUSON<br><br>on<br><br>Habeas Corpus. | D064600 |

Original proceeding on a petition for writ of habeas corpus.  Relief granted.

Law Office of Marc Eric Norton and Marc Eric Norton for Petitioner.

Kamala D. Harris, Attorney General, Jennifer A. Neill, Assistant Attorney General, Phillip Lindsay and Gregory J. Marcot, Deputy Attorneys General, for Respondent.

Kenneth Ferguson was sentenced to a life sentence for his 1996 conviction for torturing his wife, Alida Ferguson.  In August 2010, the Board of Parole Hearings (Board) found Ferguson not suitable for parole.  Ferguson challenged the Board's decision, contending it was arbitrary and capricious because the reasons given by the Board did not support the conclusion that he remains an unreasonable risk to public safety if granted parole.  We agreed and granted relief.  (*In re Ferguson* (Dec. 19, 2012,

D061630) [nonpub. opn.], (*Ferguson I*).) We remanded to the Board to hold a new hearing in accordance with due process of law, our decision and the Supreme Court's decision in *In re Prather* (2010) 50 Cal.4th 238 (*Prather*).

In April 2013, the Board held a new hearing and again concluded that Ferguson was unsuitable for parole because he currently posed an unreasonable risk of danger if released from prison. Ferguson challenges the Board's decision, contending the Board deprived him of due process because it failed to provide him an individualized consideration of all relevant factors and no evidence establishes a rational nexus to support the conclusion that he currently posed an unreasonable risk of danger if released from prison.

We grant relief as the Board deprived Ferguson of due process of law by simply reciting evidence supporting an unsuitability factor with no reasoning establishing a rational nexus between that factor and its ultimate determination of current dangerousness. As we shall explain, the new evidence considered alone or in conjunction with other evidence in the record, does not support the Board's determination that Ferguson remains currently dangerous.

FACTUAL AND PROCEDURAL BACKGROUND

In *Ferguson I*, we set forth Ferguson's preconviction history, facts relating to the life offense, and Ferguson's postconviction conduct dating to the time of the prior parole hearing in 2010. We repeat this information and then summarize the facts relating to the instant proceedings.

2

"A.  Ferguson's Preconviction History and the Offense

"Ferguson has no arrests or convictions as a juvenile.  His only adult conviction is the instant offense, committed when he was 52 years old.  He has a college education and no history of drug use or alcohol abuse.

"In July 1995, after 23 years of marriage, Alida informed Ferguson that she wanted to divorce him.  On August 28, 1995, while their son was out of the house, the couple got into an argument about how to divide Alida's jewelry.  Because Ferguson looked angry, Alida decided to leave the room.  She picked up some laundry and went to the laundry room.  As she stood in the laundry room, Ferguson hit her from behind with a 12-inch wrench.  Alida collapsed to the floor after Ferguson hit her several times in the head.  Ferguson continued the attack as Alida lay face down on the floor.

"Eventually, Ferguson put down the wrench, tried to suffocate Alida with a blanket, and then choked her around the neck.  During the struggle, Alida bit Ferguson's thumb until he stopped the attack.  Alida fled the home after Ferguson left the room.  A house cleaner working in the house next door saw Alida come out of the garage and a man follow her carrying a wrench, but the man did not leave the garage.  Ferguson called 911 claiming that Alida had attacked him.  They were both transported to the hospital where it was discovered that Alida had a fractured skull, contusions, numerous cuts to her head, a compound finger fracture and a large contusion to her right arm.  Alida had a total of 13 wounds to her head.  Although some of the wounds could have been caused by the same blow, there were at least 10 to 11 incidences where some object hit her head.

3

"The jury rejected Ferguson's claims of self-defense and, while acquitting him of attempted murder, found him guilty of torture with use of a deadly weapon, battery, corporal injury to a spouse using a deadly weapon and personally inflicting great bodily injury on the victim, and aggravated assault with personal weapon use and infliction of great bodily injury. The trial court sentenced Ferguson to life with the possibility of parole, plus one year. We affirmed the judgment on appeal.

"B. Ferguson's Postconviction Conduct [Until 2010]

"Ferguson has been discipline free during his incarceration. He has been a peer health educator for 13 years, teaching inmates to stay healthy and educating them on common prison diseases and drug use. He is a Laubach Literacy teacher; he instructs inmates on reading and teaches English to those whose first language is not English. Ferguson is also a founding member of the Victim-Offender Reconciliation Group, which raises money for charities and the community.

"Ferguson belongs to many different religious groups, studies the Bible and does anything he can to enlighten himself in the area of faith. He has received numerous laudatory chronos from psychologists, correctional officers, instructors, doctors, and the Jewish chaplain. Ferguson has taken many courses including conflict resolution, leadership skills group training and advanced leadership training. He has certificates of completion in creative conflict resolution, peer education training, disease education, group facilitation and counseling skills. In his October 2008 psychological evaluation, Dr. Richard Starrett rated Ferguson at the low range for psychopathy (PCL-R), risk of future violence (HCR-20) and future recidivism (LS/CMI).

4

"Ferguson believed that his work in the peer health education area prepared him for service in the health industry and that he could also help people learn to read. . . . Ferguson is eligible for social security benefits and has a trust account from his mother containing $90,000." (*Ferguson I*, *supra*, at pp. 2-4.)

C. The Present Proceedings

The Board conducted a new parole hearing as ordered in *Ferguson I*. Ferguson exercised his right to not speak about the commitment offense and, based on the advice of counsel, he did not participate in the hearing, except for being sworn in and reading a prepared statement. Ferguson's prepared statement takes up about four pages of the hearing transcript. Briefly, Ferguson stated that he took "total and complete responsibility" "for nearly killing Alida, and for destroying her and [their son's] lives. I am the only one responsible for my violent and senseless crime." Ferguson agreed with the prosecution's version of the facts, expressed his remorse for his crime and explained the "cause and the factors that led to [his] crime" including his fear, personal insecurities, failure to seek help and failure to remove himself from the situation. Ferguson addressed his parole plans and stated his willingness to comply with all parole conditions, including not attempting to contact Alida or his son.

Ferguson remains free of serious disciplinary infractions; however, in January 2013 he received a "counseling chrono" which the commissioner described as a warning for "some tenting in his area on the bedframe." Ferguson's cellmate wrote an affidavit taking responsibility for the infraction. The Board reviewed a letter of support voluntarily written by a registered nurse at the institution that has known Ferguson for six

5

years. He also received letters of support from four officers at the institution and a letter of appreciation for his work on a health fair event.

Based on advice of counsel, Ferguson declined to be interviewed for a psychological evaluation. Ferguson, however, paid for a private psychological evaluation with Dr. Daisy K. Switzer. In the history section of the report, Ferguson spoke about the circumstances leading to his life crime. Ferguson stated "looking back, I simply was too proud to admit that the situation of our impending divorce was out of my hands. My behavior and actions toward Alida were deplorable and unwarranted. She had every right to leave the marriage if that was her desire, and I had no right to infringe upon her decision. Ultimately, that was what I was trying to do, keep her from leaving the marriage. I nearly killed her in doing so, and for that I am very sorry to her, Kyle and all of our family members." Ferguson continued, stating: "I should have just left. I'm smart enough to get out of there. To recognize what was going on and just leave. At the time I didn't have the skills that I have now. I now realize that no one has the right to attempt to impose their will on another person; whether it be in a marriage or any other type of relationship. My unwillingness to accept the fact that Alida was divorcing me was, at the time, not a reality that I was willing to accept. I then committed the most cowardly act a person could commit, nearly bludgeoning Alida to death and in the process harming my precious son in ways that he should not have been harmed."

Dr. Switzer incorporated into her report a writing by Ferguson on the topics of insight and remorse. Dr. Switzer noted that Ferguson "expressed that he now understands that the fear of abandonment/loss of his wife and son and his standing in the community,

6

along with his resentment toward his wife for wanting to divorce him, were contributing factors to his explosive anger. He also recognizes that he had defects in his character such that he was critical of his wife and her family because of lifestyle choices they made which were incompatible with his views. He readily acknowledged that his judgmental nature of others was inappropriate and that today he accepts others' views and choices even if they differ from his own."

Dr. Switzer reviewed Ferguson's initial parole suitability hearing wherein Ferguson acknowledged that his son was a victim. She noted that Ferguson "reiterated his understanding of the profound effect this crime had on his son during the current interview" and that one of Ferguson's "biggest sorrows had been the understanding of how much [he] hurt [his son]." Dr. Switzer concluded that Ferguson posed a low likelihood to become involved in any new offense if released.

The Board also heard from Alida wherein she expressed her belief that Ferguson would murder her if released from prison. During her presentation, Alida referred to a "booklet" of her history with Ferguson. The Board found Ferguson unsuitable for parole and denied parole for three years. Ferguson filed a writ petition in this court, and we issued an order to show cause why the relief requested should not be granted.

## II. DISCUSSION

A. General Legal Principles

The Legislature can mandate that persons who commit certain crimes be incarcerated, without possibility of parole. (E.g., Pen. Code, § 190.2, undesignated statutory references are to the Penal Code.) Where, as here, an individual is sentenced to

7

a life term with the possibility of parole, release on parole is the rule, rather than the exception. (*In re Lawrence* (2008) 44 Cal.4th 1181, 1204 (*Lawrence*).) Nonetheless, a life prisoner will be denied parole if the Board determines the inmate will pose an unreasonable risk of danger to society if released from prison. (Cal. Code Regs., tit. 15, § 2402, subd. (a).)

In determining whether an inmate is suitable for parole, the Board must consider "[a]ll relevant, reliable information," such as the nature of the commitment offense including behavior before, during, and after the crime; the prisoner's social history; mental state; criminal record; attitude towards the crime; and parole plans. (Cal. Code Regs., tit. 15, § 2281, subd. (b).) Circumstances tending to show unsuitability for parole include that the inmate: (1) committed the offense in a particularly heinous, atrocious, or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) has previously sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (Cal. Code Regs., tit. 15, § 2281, subd. (c).) Circumstances tending to indicate suitability for parole include that the inmate: (1) does not have a juvenile record; (2) has a stable social history; (3) has shown signs of remorse; (4) committed his or her crime as a result of significant stress in his life, especially if the stress had built up over a long period of time; (5) committed the crime as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for

release; and (9) has participated in institutional activities that indicate an enhanced ability to function within the law upon release.  (Cal. Code Regs., tit. 15, § 2281, subd. (d).)

The Board's discretion to determine parole suitability is " 'great' " and " 'almost unlimited.' "  (*In re Powell* (1988) 45 Cal.3d 894, 902.)  Nonetheless, the requirement of procedural due process embodied in the California Constitution (Cal. Const., art. I, § 7, subd. (a)) places limitations upon the Board's discretionary authority.  (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 (*Rosenkrantz*).)  "Under the 'some evidence' standard of review, the parole authority's interpretation of the evidence must be upheld if it is *reasonable*, in the sense that it is not arbitrary, and reflects *due consideration* of the relevant factors."  (*In re Shaputis* (2011) 53 Cal.4th 192, 212 (*Shaputis II*), italics added.)  "The executive decision of the Board . . . is upheld unless it is arbitrary or procedurally flawed."  (*Id.* at p. 221.)

To protect against the abrogation of an inmate's right to due process our high court has held that "the Board must provide a definitive written statement of its reasons for denying parole" and " 'consider *all* relevant factors.' "  (*Rosenkrantz, supra*, 29 Cal.4th at p. 655.)  At the hearing, the presiding hearing officer is statutorily required to "state his or her findings *and supporting reasons* on the record."  (§ 3042, subd. (c), italics added.)  Additionally, the Board must provide a statement "setting forth the reason or reasons for refusal to set a parole date, and suggest activities in which [the prisoner] might participate that will benefit him or her while he or she is incarcerated."  (§ 3041.5, subd. (b)(2).)  These statutory requirements are echoed in the regulations promulgated pursuant to legislative authorization.  (§ 5076.2; Cal. Code Regs., tit. 15, § 2254 [Record of hearing

9

shall include "the findings of the hearing panel with supporting reasons."]; Cal. Code Regs., tit. 15, § 2255 [Prisoner "shall receive a copy of the decision specifying the decision, the information considered and the reasons for the decision."].)

While the Board must articulate the reasons for its decision, it is not required to "comprehensively marshall the evidentiary support for its reasons." (*Shaputis II*, *supra*, 53 Cal.4th at p. 214, fn. 11.) We review the record in the light most favorable to the Board's decision "to determine whether it discloses some evidence—a modicum of evidence—supporting the determination that the inmate would pose a danger to the public if released on parole." (*Id*. at p. 214.) Any relevant evidence that supports the parole authority's determination is sufficient to satisfy the "some evidence" standard. (*Ibid.*)

The paramount consideration, however, is whether the inmate currently poses a threat to public safety; thus, there must be some evidence " 'demonstrating that an inmate poses a current threat to public safety, rather than merely some evidence suggesting the existence of a statutory factor of unsuitability.' " (*Shaputis II*, *supra*, 53 Cal.4th at p. 209.) As our high court has stated, this deferential standard is not "toothless" and " 'due consideration' of the specified factors requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness." (*Lawrence*, *supra*, 44 Cal.4th at p. 1210.)

In summary, the Board's interpretation of the evidence must be reasonable, some evidence must support the Board's factual findings, and the Board's reasoning must

establish that a rational connection exists between the Board's findings and its ultimate conclusion that the inmate is currently dangerous.

B. Review on Remand

In *Ferguson I*, we remanded the matter to the Board with directions "to vacate its decision denying parole and thereafter proceed in accordance with due process of law and consistent with the decision of this court" and *Prather*. In *Prather*, the Supreme Court addressed the extent to which the courts, in remanding parole suitability determinations to the Board, may limit the Board's consideration of evidence. (*Prather*, *supra*, 50 Cal.4th. at pp. 243-244.)

The *Prather* court stated that "[i]n conducting a suitability hearing after a court's grant of habeas corpus relief, the Board is bound by the court's findings and conclusions regarding the evidence in the record and, in particular, by the court's conclusion that no evidence in the record before the court supports the Board's determination that the prisoner is unsuitable for parole. Thus, an order generally directing the Board to proceed in accordance with due process of law does not entitle the Board to 'disregard a judicial determination regarding the sufficiency of the evidence [of current dangerousness] and to simply repeat the same decision on the same record.' [Citation.] Rather, a judicial order granting habeas corpus relief implicitly precludes the Board from again denying parole— unless some *additional* evidence (considered alone or in conjunction with other evidence in the record, and not already considered and rejected by the reviewing court) supports a determination that the prisoner remains currently dangerous." (*Prather*, *supra*, 50 Cal.4th at p. 258.) Generally, additional evidence will be new; however, the court explained that

11

new evidence may only be probative when considered with other evidence already in the record or that review of the record reveals additional grounds supporting a decision to deny parole. (*Ibid.*)

Accordingly, we must examine the entire record to determine whether any new evidence, when reviewed in light of the entire record, supports the Board's determination that Ferguson remains currently dangerous. This is in addition to the requirement that the Board's interpretation of the evidence be reasonable, that some evidence supports the Board's factual findings, and some rational connection exists between these findings and its conclusion that the inmate is currently dangerous.

C. Analysis

1. Consideration of All Relevant Suitability Factors

Ferguson asserts the Board failed to provide him an individualized consideration of all relevant factors, thus depriving him of due process. Ferguson claims that the Board "completely" ignored the significant stress he was under at the time of his life crime. We disagree.

As a preliminary matter, the record does not include the required written statement setting forth the Board's reason or reasons for refusing to set a parole date. (§ 3041.5, subd. (b)(2).) For purposes of analysis, we will presume this requirement was satisfied by the written transcript of the commissioner's verbal pronouncement of the decision. (§ 3042, subd. (c).)

Review of the Board's 12 page oral decision reveals the Board mentioned seven of eight relevant suitability factors. (Cal. Code Regs., tit. 15, § 2281, subd. (d)(5) [battered woman syndrome not relevant].) The Board noted that Ferguson does not have a juvenile record, the commitment crime is his only offense, he participated in institutional activities as he is "heavily involved" as a health educator, and he has positive parole plans. (Cal. Code Regs., tit. 15, § 2281, subd. (d)(1), (6), (8) & (9).) The Board also touched on the issue of remorse, commenting that while Ferguson initially blamed others, "[t]hat seems to have resolved itself." (Cal. Code Regs., tit. 15, § 2281, subd. (d)(3).) The regulations consider "reasonably stable relationships with others" to be a positive social history factor. (Cal. Code Regs., tit. 15, § 2281, subd. (d)(2).) The Board mentioned "social history," stating "there had been some comments and concerns" and that it looked at his employment, the "problematic" relationship with Alida, and Ferguson's admission that he sometimes drank "more than [he] should have."

As Ferguson notes, a suitability factor of major importance on this record is whether he committed the life crime as a result of significant long-term stress. (Cal. Code Regs., tit. 15, § 2281, subd. (d)(4).) Although the Board never expressly acknowledged that the record supports a finding that Ferguson committed the life crime as a result of significant long-term stress, it stated that "[i]n the time leading up [to] the commitment offense, you did appear to be having difficulty adjusting to [Alida's] request for a divorce, as evidenced by her claims of you excessively crying and threatening suicide." This statement amounts to an implied finding that Ferguson committed the life crime as a result of long-term stress. Moreover, as we pointed out in *Ferguson I*,

13

Ferguson "committed a *single* horribly violent criminal act while subject to significant and unusual emotional stresses that are not likely to recur." (*Ferguson I*, at p. 14) The reports of Drs. Reynoso and Switzer, alone or in consideration with the entire record, do not contain any evidence to rebut our conclusion and the Board is bound by it. (*Prather*, *supra*, 50 Cal.4th at p. 258.)

Finally, the Board's decision never mentions that Ferguson's advanced age reduces the probability of recidivism. (Cal. Code Regs., tit. 15, § 2281, subd. (d)(7).) Nonetheless, the Board did state in its decision that the life crime occurred in 1995 and noted during the hearing that it considered Dr. Reynoso's evaluation, which included Ferguson's date of birth and that Ferguson was 70 years old. We conclude that the evidence in the record shows that Ferguson's advanced age is rationally indicative only of suitability for parole, not unsuitability, and does not establish any likelihood that Ferguson would present a risk to public safety if released on parole.

Accordingly, we reject Ferguson's contention that relief must be granted because the Board's decision was procedurally flawed in that it did not reflect "due consideration" of all specified statutory and regulatory factors as applied to the individual prisoner. (*Shaputis II*, *supra*, 53 Cal.4th at p. 210; *In re Stoneroad* (2013) 215 Cal.App.4th 596, 616.)

Thus, we turn to the unsuitability factors addressed by the Board. As we shall discuss, the Board's consideration of the unsuitability factors is procedurally flawed as the evidence does not support the Board's finding that Ferguson lacks insight and, even assuming arguendo that a modicum of evidence supports this unsuitability factor, the

14

Board's reasoning does not establish a rational connection between this finding and the Board's ultimate conclusion that Ferguson is currently dangerous. (*Shaputis II*, *supra*, 53 Cal.4th at p. 221.)

2. Unsuitability Factors Cited by the Board

As a preliminary matter, we note that individualized consideration of all relevant factors is *not* satisfied by some rote or pro forma recitation on the record of the suitability factors followed by a conclusion that the suitability factors are outweighed by evidence showing unsuitability for parole. Rather, the Board is obligated by statute and regulation to set forth its reasoning. (§§ 3042, subd. (c), 3041.5, subd. (b)(2); Cal. Code Regs., tit. 15, §§ 2254, 2255.) Here, while the Board's decision contains a pro forma statement that "the circumstances that make you unsuitable for parole . . . outweigh the positive aspects of your case[,]" we cannot discern the Board's reasoning for this conclusion.

We also note that at the hearing, Deputy District Attorney Richard Sachs urged the Board to state a nexus existed between Ferguson's lack of insight and current dangerousness, arguing that this would satisfy the guidelines set forth in *Ferguson I*. The Board properly declined this invitation to make a pro forma recitation on the record of some "magic words." The duty of the Board is to give individualized consideration to all relevant factors and explain its reasoning why evidence of a particular unsuitability factor shows that the inmate is currently dangerous. (*Rosenkrantz*, *supra*, 29 Cal.4th at pp. 676-677; *Lawrence*, *supra*, 44 Cal.4th at pp. 1210, 1212.) We need reasoning, not magic words. (As an aside, we point out that attorneys owe a duty to "maintain the respect due to the courts of justice and *judicial officers*." (Bus. & Prof. Code, § 6068, subd. (b),

15

italics added.) Our review of attorney Sachs's arguments to the Board show that some of his comments crossed the line.)

The Attorney General contends the Board provided "ample reasoning" to support its conclusion that Ferguson is currently dangerous. As support for this contention, the Attorney General does not cite any specific portion of the Board's decision; rather, it cites to the entire decision. This citation is not helpful and wholly insufficient. Thus, with little help from the Attorney General, we review the Board's decision to determine whether evidence of unsuitability exists and, if so, whether the evidence of unsuitability supports its conclusion that Ferguson is currently dangerous.

a. Unsuitability Factor: Counseling Chrono

During the hearing, the Board acknowledged that Ferguson had no history of discipline, but that he picked up a "counseling chrono" in January 2013 which it described as "not disciplinary in nature, per se, but more of a warning" for "some tenting in his area on the bedframe." Ferguson's cellmate signed an affidavit taking responsibility for the infraction, which Ferguson presented to the Board.

Although recent discipline may provide a basis for denying parole, such discipline "supports a denial of parole only if it is rationally indicative of the inmate's current dangerousness." (*Shaputis II*, *supra*, 53 Cal.4th at p. 219.) In denying parole, the Board noted that Ferguson had acquired a single "counseling chrono." The Board, however, did not find that this new evidence, either alone or in connection with the entire record, supported a finding of unsuitability for parole or evidence current dangerousness. Rather, as other courts have noted, nonviolent minor misconduct does not rationally support a

16

finding that an inmate is currently dangerous. (See, e.g., *In re Palermo* (2009) 171 Cal.App.4th 1096, 1110 ["Nothing in the record supports a conclusion that [an inmate] poses a threat to public safety because he once engaged in the unauthorized use of a copy machine, once participated in a work strike, and once was found in possession of a fan stolen by his roommate."]; *In re Hunter* (2012) 205 Cal.App.4th 1529, 1543 [same].) We conclude that this new evidence, when viewed with other evidence in the record, does not support the Board's conclusion that Ferguson poses an unreasonable risk of danger if released from prison.

b. Unsuitability Factor: Lack of Insight

The Board is required to consider an inmate's "past and present attitude toward the crime" (Cal. Code Regs., tit. 15, § 2281, subd. (b)) and "the presence of remorse." (Cal. Code Regs., tit. 15, § 2281, subd. (d)(3)). Remorse includes indications that the inmate "understands the nature and magnitude of the offense." (*Ibid.*) These factors fit within the descriptive category of " 'insight.' " (*Shaputis II*, *supra*, 53 Cal.4th at p. 218.) "[A] 'lack of insight' into past criminal conduct can reflect an inability to recognize the circumstances that led to the commitment crime; and such an inability can imply that the inmate remains vulnerable to those circumstances and, if confronted by them again, would likely react in a similar way." (*In re Rodriguez* (2011) 193 Cal.App.4th 85, 98.) In inmate's level of insight as reflected by " 'changes in a prisoner's maturity, understanding, and mental state' are 'highly probative . . . of current dangerousness.' " (*Shaputis II*, *supra*, 53 Cal.4th at p. 218.) "Thus . . . the presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the inmate's

17

dangerous past behavior and the threat the inmate currently poses to public safety." (*Ibid.*)

We concluded in *Ferguson I* that Ferguson's expressions of remorse were consistent, undisputed and dated back to at least 2006. (*Ferguson I*, at p. 14.) This conclusion is binding on the Board unless some new evidence, when considered in conjunction with the entire record, supports a contrary finding. (*Prather*, *supra*, 50 Cal.4th at p. 258.) In its decision, the Board did not find that Ferguson lacked remorse, nor did it cite lack of remorse as a basis for its ultimate conclusion that Ferguson posed an unreasonable risk to public safety if paroled. Although the Board read into the record Dr. Reynoso's written comment that Ferguson's level of regret for harming Alida was refuted by a notation in a Mental Health Interdisciplinary Note dated in 2007, nothing in the Board's decision suggests it considered this comment probative on Ferguson's current level of remorse. Rather, the Board found that Ferguson "lack[ed] insight into the causative factors of [his] conduct" and this was its "primary concern." After weighing the evidence, the Board found Ferguson currently dangerous and unsuitable for parole because his lack of insight outweighed the positive aspects of his case. As evidentiary support for this conclusion the Board cited Ferguson's failure to speak about the crime at the hearing, and the evaluations by Drs. Reynoso and Switzer. We turn to the record to evaluate whether the Board reasonably interpreted the evidence and whether the evidence supports the Board's finding that Ferguson lacks insight into the causative factors of his conduct.

18

As new evidence, the Board first cited Ferguson's exercise of his right to not speak about the crime, stating this action "eliminated the opportunity for the Panel to make an independent assessment as to your current insight into the commitment offense." California Code of Regulations, title 15, section 2236, provides in part: "A prisoner may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available *and the refusal shall not be held against the prisoner*." (Italics added.)

In *Shaputis II*, our high court summarized five fundamental principles governing our review of parole decisions, including that "[t]he inmate has a right to decline to participate in psychological evaluation and in the hearing itself. That decision may not be held against the inmate." (*Shaputis II*, *supra*, 53 Cal.4th at p. 221.) The Board violated this principle by using Ferguson's refusal to speak about the crime at the hearing as "evidence" that Ferguson lacked insight into the causative factors of his conduct. Because Ferguson's refusal to discuss the facts of the crime with the Board cannot be used as evidence of a lack of insight, this fact does not support a finding of current dangerousness. Similarly, the Board cannot "hold a refusal to discuss the crime against the inmate when it weighs the credibility of [recent] information against other evidence in the record." (*Id.* at p. 212.)

The Board then reviewed the new evidence in the record; namely, the reports from Drs. Reynoso and Switzer, in connection with the entire record. Thus, we review this new evidence to determine whether it, when viewed with historical information, supports

19

the Board's conclusion that Ferguson lacks insight into the causative factors of his conduct.

The Board relied heavily on Dr. Reynoso's written report in its decision. It quoted extensively from Dr. Reynoso's report and seemingly adopted Dr. Reynoso's statements as evidentiary support for its conclusion that Ferguson lacked insight and was thus currently dangerous. We are troubled by the Board's use of Dr. Reynoso's report as evidence of Ferguson's insight as it ignores that Dr. Reynoso *did not* assess Ferguson's *current* level of insight into the causative factors pertaining to the life crime.

Dr. Reynoso specifically noted in her report that because she did not conduct a clinical interview she could not assess "whether or not there have been changes and/or improvements to Mr. Ferguson's understanding of the causative factors of the life crime or whether he is more accepting about the true extent of the victim's injuries." Again, the Board cannot hold Ferguson's refusal to participate in the psychological evaluation against him. (*Shaputis II*, *supra*, 53 Cal.4th at p. 221.)

Because Dr. Reynoso did not assess Ferguson's current level of insight or attitude toward the injuries he inflicted, the Board could not use Dr. Reynoso's summary of historical information as some evidence that Ferguson *currently* lacked insight into the causative factors pertaining to the life crime and was thus *currently* dangerous. Moreover, Dr. Reynoso's ultimate conclusion that Ferguson presented a "low" risk of violence undercuts any reliance by the Board on Dr. Reynoso's historical summary as evidence of current dangerousness.

20

Dr. Reynoso noted that Ferguson "has not spoken about the amount of force he perpetrated against [Alida] and the extent of her injuries *with accuracy in the past*." (Italics added.) We agree. As we noted in *Ferguson I*, Ferguson initially claimed that Alida had attacked him and "rationalized and denied aspects of his crime." (*Ferguson I*, at p. 9.) It was not until 2004 that Ferguson took what an evaluator considered to be a positive step, by writing two letters of remorse and admitting his violent crime. (*Ibid.*)

Thereafter, a 2006 evaluation "found that Ferguson took 'blame for his role and [saw] his prior judgment as poor.' 'Ferguson stated that he [felt] terrible about his behavior during the instant offense. He had felt frustrated and had some difficulties in communicating with his wife. They were going through a divorce. Pent-up frustrations and angry feelings had bubbled over to the instant offense. He said he feels very bad that he hurt his wife and that she is having ongoing mental difficulties.' The evaluator concluded, 'It appears, from what [Ferguson] stated during this evaluation, that he has taken ownership of his thoughts and his feelings and responsibility for his actions during the instant offense. It was noted that communicating was an important factor and it was noted that his completion of his self-help and therapy rehabilitative course within the CDCR in 2006 helped him to be able to articulate the lifestyle that he has chosen to live, which is a healthy and law-abiding one.' " (*Ferguson I*, at p. 10.)

A 2008 evaluation similarly "concluded that Ferguson accepted responsibility for the crime, stating Ferguson 'readily acknowledged responsibility for the crime. He listed a number of stressors at the time of the crime that were affecting him: particularly, abandonment issues and the stress of divorce. He acknowledges the fact that he went into

21

a rage and lost control. The inmate has been in the mental health program for many years and has had a chance to explore his life crime through access to the mental health department and other resources available to him. The inmate appears to have spent a considerable amount of time attempting to understand his background and other influences in the controlling case. [¶] It is unlikely that a requirement for further exploration of the instant offense will produce more significant behavioral changes of a positive or prosocial nature in the inmate.' " (*Ferguson I*, at pp. 10-11.) The Board seemingly ignored this evidence and instead focused on Dr. Reynoso's statement that "in the past" Ferguson had not accurately spoken about the force he used or the extent of Alida's injuries.

The Board also relied on Ferguson's most recent psychological interview with Dr. Switzer. The Board used Dr. Switzer's report to conclude that "inconsistencies" existed between Ferguson's and Alida's version of the crime based on Ferguson's prepared statement to Dr. Switzer. To the extent this was offered as a basis for the parole denial, it is unsupported by the evidence. Ferguson's prepared statement to Dr. Switzer addressed his remorse and insight into what caused the life crime. Other than stating that he "agrees with the Prosecution's version of the events," Ferguson *did not* address the facts of the crime in his prepared statement to Dr. Switzer. Thus, we are a bit befuddled by the Board's finding that Ferguson's version of the crime as set forth in his prepared statement to Dr. Switzer was inconsistent with Alida's version of the crime.

The Board also noted that in response to Dr. Switzer's request to define insight, Ferguson stated " 'I don't use the term. I was not taught in class, and I have to think about what it means, since it's such a vague concept.' " Ferguson then articulated, " '[s]ince sight is to see, [insight is] the mirror, it's looking into myself.' " The Board stated it was unreasonable for Ferguson to consider insight to be an unfamiliar and vague concept. In *Ferguson I*, we noted that the Board picked Ferguson's words apart. (*Ferguson I*, at p. 11.) It appears the Board is again doing so. Dr. Switzer asked Ferguson to define insight and Ferguson explained what the term meant to him. Ferguson's failure to define the term to the Board's satisfaction is not rationally related to whether Ferguson *has developed insight* into what caused his crime, a matter left to the Board's determination. As our high court explained "expressions of insight and remorse will vary from prisoner to prisoner and . . . there is no special formula for a prisoner to articulate in order to communicate that he or she has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior." (*Shaputis*, *supra*, 44 Cal.4th at p. 1260, fn. 18.)

Critically, neither Dr. Reynoso nor Dr. Switzer concluded that Ferguson lacked insight into the causative factors of the crime. Dr. Switzer noted that Ferguson "expressed that he now understands that the fear of abandonment/loss of his wife and son and his standing in the community, along with his resentment toward [Alida] for wanting to divorce him, were contributing factors to his explosive anger." Although Dr. Reynoso could not opine on Ferguson's *current* level of insight, after thoroughly reviewing Ferguson's entire record she concluded that Ferguson has "taken an increased level of responsibility for his role in the crime, and . . . seems to understand the origins of his

23

anger at the time." She also found that Ferguson has "come to terms with the underlying causes of [his] rage response, feelings of abandonment and grief over the loss of [his] family structure." She also concluded that Ferguson presented a low risk of violence. Dr. Reynoso came to these conclusions despite her concerns regarding Ferguson's *past* expressions of insight and *past* verbalizations regarding the injuries he inflicted on Alida.

The Attorney General contends that in his prepared statement to the Board Ferguson "completely failed to discuss" the magnitude of his crime and "blatant[ly] disregard[ed]" the mental and physical suffering he caused his victims. The Attorney General misrepresents the record. In his prepared statement, Ferguson stated that his "out of control, violent behavior" was inexcusable. He described his actions as a "brutal attack," admitted that he almost killed Alida by bludgeoning her, that he harmed his son "in ways . . . he should not have been harmed," and that his "cowardly act" destroyed Alida's life and their son's life. Ferguson's prepared statement to the Board cannot rationally be considered an attempt to minimize the magnitude of his crime or the suffering he caused his victims.

We do not reweigh the evidence; rather, we find that the new evidence, when viewed in conjunction with the prior record, simply does not support the Board's conclusion that Ferguson lacks insight into the causative factors of his life crime. "Where, as here, undisputed evidence shows that the inmate has acknowledged the material aspects of his or her conduct and offense, shown an understanding of its causes, and demonstrated remorse, the [Board's] mere refusal to accept such evidence is not itself a rational or sufficient basis upon which to conclude that the inmate lacks insight, let

24

alone that he or she remains currently dangerous." (*In re Ryner* (2011) 196 Cal.App.4th 533, 549.)

The Attorney General suggests the Board found that Ferguson's inaccurate statements regarding his job history support a conclusion that Ferguson lacks credibility and thus, the Board reasonably found that all of Ferguson's statements regarding his insight lacked credibility. First, nothing in the Board's decision supports this suggestion. The Board is *required* to state its reasoning. (§ 3042, subd. (c); Cal. Code Regs., tit. 15, § 2254.) Had the Board found that Ferguson's statements regarding his employment history impacted his overall credibility and thus reasoned that Ferguson's current expressions of insight were not credible and that Ferguson posed a danger to the community if released on parole, it should have so stated. It did not. Moreover, Ferguson will never qualify for parole under this type of analysis as his past statements regarding his job history are an immutable factor.

In any event, for the sake of argument, we will infer the Board reasoned that Ferguson's past statements regarding his job history indicate that his current expressions of insight lacked credibility. While this lack of credibility is some evidence showing potential unsuitability for parole, this is not the end of our review. Rather, we must look for " 'whether there exists "some evidence" demonstrating that an inmate poses a current threat to public safety. ' " (*Shaputis II*, *supra*, 53 Cal.4th at p. 209.)

As we pointed out in *Ferguson I*, "[i]t is not enough for the Board to simply state we do not believe the inmate's expressions of insight and remorse and thus find the inmate is currently dangerous. 'If simply pointing to the existence of an unsuitability

25

factor and then acknowledging the existence of suitability factors were sufficient to establish that a parole decision was not arbitrary, and that it was supported by " 'some evidence,' " a reviewing court would be forced to affirm any denial-of-parole decision linked to the mere existence of certain facts in the record, even if those facts have no bearing on the paramount statutory inquiry. Such a standard, because it would leave potentially arbitrary decisions of the Board or the Governor intact, would be incompatible with our recognition that an inmate's right to due process "cannot exist in any practical sense without a remedy against its abrogation." ' (*Lawrence*, *supra*, 44 Cal.4th at p. 1211.)" (*Ferguson I*, at p. 14.)

In summary, the Board did not reason that Ferguson's credibility issues regarding his prior employment impacted his overall credibility. Even if the Board had used such reasoning as a basis for concluding that Ferguson lacked insight into the causative factors of his conduct, the existence of some evidence supporting a lack of insight is not the end of the analysis. There must be some connection between the lack of insight and the Board's conclusion that Ferguson is currently dangerous. We find no rational connection. All of the experts who evaluated Ferguson concluded he did not pose a security risk. The Board's determination that Ferguson is currently dangerous cannot be predicated upon "a hunch or intuition." (*Lawrence*, *supra*, 44 Cal.4th at p. 1213.) Our review of the new evidence and the entire record does not reveal a rational basis supported by some evidence to support the Board's conclusion that Ferguson will pose an unreasonable risk to public safety if paroled.

26

Although not addressed by the parties, we must comment on the Board's stated reasoning for denying parole: "Today the Panel was unable, with any degree of confidence, to determine your predictability, leaving the Panel with the conclusion that this . . . predictability issue . . . does impact your current risk of danger." Our review of the entire record does not support the Board's conclusion that Ferguson is unpredictable and a danger to the public for this reason. Ferguson is college educated, has no history of drug use or alcohol abuse, has no juvenile record and the life crime is his only adult conviction. Other than the recent counseling chrono, Ferguson has no history of prison discipline. Additionally, the Board acknowledged Ferguson's numerous accomplishments and letters of support. We find no evidence in the record to support the Board's conclusion that Ferguson presents as unpredictable and thus currently dangerous.

Finally, we acknowledge Alida's impassioned plea to the Board asking that Ferguson remain incarcerated and expressing her belief that Ferguson "will murder" her if released on parole. Although defense counsel characterized Alida's concerns as "delusional," we do not. Unfortunately, the impact of a violent crime can be long-lasting and, indeed, life-long. Alida's concerns, however, can be addressed by special parole conditions, including continuous electronic monitoring. (Cal. Code Regs., tit. 15, §§ 2513, subd. (g), 3010, 3540, *et seq.*)

27

DISPOSITION

The relief sought in the petition for writ of habeas corpus is granted. The Board is directed to vacate its decision denying parole and thereafter proceed in accordance with due process of law and consistent with the decision of this court. (*Prather*, *supra*, 50 Cal.4th 238.) The Board is bound by our "findings and conclusions regarding the evidence in the record" and by our "conclusion that no evidence in the record before [us] supports the Board's determination that [Ferguson] is unsuitable for parole." (*Id.* at p. 258.) The Board is precluded from again denying parole unless some additional evidence, considered alone or in conjunction with other evidence in the record, and not already considered and rejected by us, supports a determination that Ferguson remains currently dangerous. (*Ibid.*) In the interests of justice, this decision is made final as to this court seven days from the date of filing. (Cal. Rules of Court, rule 8.387(b)(3)(A).)


McINTYRE, J.

I CONCUR:


McDONALD, J.

28

McCONNELL, P. J., Dissenting.

I respectfully dissent. If a court grants habeas relief after concluding there is not some evidence in the record to support the Board's determination a prisoner is unsuitable for parole, the Board is bound by the court's conclusion. The Board may not again deny parole "unless some *additional* evidence (considered alone or in conjunction with other evidence in the record, and not already considered and rejected by the reviewing court) supports a determination that the prisoner remains currently dangerous." (*In re Prather* (2010) 50 Cal.4th 238, 258.) The additional evidence may be new. It may also be existing evidence from the full record revealing additional grounds for denying parole. (*Ibid.*)

In Ferguson's prior appeal, the majority noted Ferguson had continually expressed insight and remorse for his crime, but concluded there was some evidence his statements of insight and remorse lacked credibility. Nevertheless, the majority granted Ferguson habeas relief because, in the majority's view, the Board did not adequately articulate a nexus between Ferguson's lack of credibility and his present dangerousness.[1] As this basis for granting relief did not rely on an adverse evidentiary conclusion, the Board arguably was not required to reference additional evidence to support its determination on remand. Even assuming to the contrary, I believe there is some additional evidence in the

---

[1]    The majority also concluded there was not some evidence to support the Board's determination Ferguson lacked adequate parole plans. This is no longer an issue as, on remand, the Board determined Ferguson's parole plans were adequate.

record to support the Board's decision on remand and I would, therefore, deny habeas relief.

It bears repeating "under the 'some evidence' standard, '[o]nly a modicum of evidence is required.  Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of [the Board . . . ] . . . .  [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of [the Board . . . ] . . . .  *It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole.*' "  (*In re Shaputis* (2011) 53 Cal.4th 192, 210 (*Shaputis II*), italics added.)  Thus, "[w]hen reviewing a parole unsuitability determination by the Board . . . , a court must consider the whole record in the light most favorable to the determination before it, to determine whether it discloses some evidence—a modicum of evidence—supporting the determination that the inmate would pose a danger to the public if released on parole.  [Citations.]  The court may not . . . substitute its own credibility determination for that of the parole authority.  [Citations.]  *Any relevant evidence that supports the parole authority's determination is sufficient to satisfy the 'some evidence' standard.*"  (*Id.* at p. 214, italics added.)

In my dissent in the prior appeal, I described at length the record evidence supporting a determination Ferguson's expressions of insight and remorse lacked credibility.  (*In re Ferguson* (Dec. 19, 2012, D061630) [nonpub. opn.] (dis. opn. of McConnell, J., pp. 2-6).)  This evidence has not changed and remains sufficient in my view to support a determination Ferguson is currently dangerous.  In addition to this

2

evidence and the other evidence in the full record, the Board on remand received a

comprehensive risk assessment from Dr. Kristina Reynoso, a private psychological

evaluation from Dr. Daisy K. Switzer, a prepared statement read by Ferguson, and

documents from Ferguson's former wife supporting her claims regarding Ferguson's lack

of credibility.[2]

The Board implicitly gave the most credence to Dr. Reynoso's assessment. As

Ferguson exercised his right to decline an interview with Dr. Reynoso, she based the

assessment on her review of Ferguson's file. She diagnosed Ferguson with "Major

Depressive Disorder, recurrent, mild, by history." She also diagnosed him with

"Personality Disorder Not Otherwise Specified with narcissistic features, provisional."

The second diagnosis was based on Ferguson's history, as related by his former wife, of

"overinflating his accomplishments, pathological lying, conning and manipulating

employers for his monetary gain, as well as demonstrating a marked lack of empathy

towards his wife in the face of divorce." The diagnosis was provisional because the

information underlying it was one-sided.

Dr. Reynoso noted she could not assess Ferguson's current insight into and

understanding of the causative factors of his crime without interviewing him.

Nonetheless, she noted "he has never verbalized the true extent of the injuries he inflicted

---

[2]      There was also evidence Ferguson had received a recent counseling chrono for
unauthorized tenting in his cell. "A 'chrono' is an institutional documentation of
information about inmates and inmate behavior." (*In re Stoneroad* (2013) 215
Cal.App.4th 596, 606, fn. 4.) It does not appear the Board gave appreciable weight to the
chrono in reaching its decision.

upon his wife." She also observed "his level of regret for harming his wife was refuted by a notation in a mental health interdisciplinary note dated 3/6/07, which indicated his disdain for his wife, who at his hearing, apparently lied to the Board about his character."

Dr. Reynoso concluded Ferguson represented "a low or non-elevated risk of violence." However, she identified several "risk factors correlated with future risk of violent recidivism," including his past employment problems, his history of depression, his personality disorder, and his failure to accurately acknowledge "the amount of force he perpetuated against his wife and the extent of her injuries." Dr. Reynoso concluded her report by stating, "[I]t does not seem as if [Ferguson] has yet to fully come to terms or been willing to verbalize the extent of injuries he inflicted upon his wife. [He] may benefit from taking a more probative look at the severity of his anger reaction towards his source of irritation at the time (wife)."

Based on Dr. Reynoso's assessment and the Board's own review of the full record, including Ferguson's inconsistent portrayals of himself, the crime, and his acceptance of responsibility and remorse, the Board concluded Ferguson lacked insight into his crime. Consequently, the Board "was unable, with any degree of confidence, to determine [Ferguson's] predictability, leaving [it] with the conclusion that . . . the predictability issue . . . does impact [Ferguson's] current risk of danger."

Dr. Reynoso's assessment provides more than a modicum of evidence to support the Board's decision. Moreover, the Supreme Court has repeatedly observed "a parole release proceeding is an attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." (*In re Sturm*

4

(1974) 11 Cal.3d 258, 266; accord, *Shaputis II*, *supra*, 53 Cal.4th at p. 219; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 655.) It logically follows the Board's inability to make a favorable prediction will justify denial of parole at least where, as here, it is caused by and supported by evidence of the inmate's ongoing lack of credibility as to his insight and remorse. To conclude otherwise would fail to recognize the Board's superior position to weigh evidence and make credibility determinations or to accord it the deference due it under the separation of powers doctrine.

To support its decision to grant Ferguson relief, the majority emphasizes the statements in Ferguson's prepared remarks and Dr. Switzer's evaluation. While the record shows the Board considered this evidence, the Board implicitly gave the evidence little weight, which was within its discretion to do and not unreasonable. As the majority acknowledged in Ferguson's prior appeal, the Board had reason to question Ferguson's credibility. He has a long history of providing misinformation and coloring facts to portray himself in the best possible light. His utilization of a prepared statement and decision not to discuss his case with the Board on remand, although his right, deprived the Board of an opportunity to allay its credibility concerns. The Board was entitled to take the record as it found it—replete with evidence Ferguson's remarks could not be accepted at face value. (*Shaputis II*, *supra*, 53 Cal.4th at p. 212 ["An inmate who refuses to interact with the Board at a parole hearing deprives the Board of a critical means of evaluating the risk to public safety that a grant of parole would entail. In such a case, the Board must take the record as it finds it."].)

5

Dr. Switzer's evaluation of Ferguson's insight and remorse consists almost exclusively of quoting Ferguson's own statements on these points. The evaluation also largely ignores Ferguson's former wife's claims and baldly asserts Ferguson is "not personality disordered" without making any attempt to dispute Dr. Reynoso's contrary diagnosis. Accordingly, the Board could have reasonably found the evaluation offered no new information or helpful analysis.

The majority also repeatedly suggests the Board's statement of reasons was infirm. Controlling case law requires the Board's decision to include "reasoning establishing a rational nexus between [the relevant] factors and the necessary basis for the ultimate decision—the determination of current dangerousness." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1210.) The majority does not cite to any authority, nor am I aware of any, requiring the Board to establish the requisite rational nexus with technical precision. In my view, the Board articulated the requisite rational nexus by explaining Ferguson's lack of credibility on the issues of insight and remorse made his current dangerousness too unpredictable for the Board to confidently release him into the community.

While the Board's remarks about why it denied Ferguson parole may not have been artful, this does not make them inadequate. The adequacy of a statement of reasons is determined by whether the statement furthers its desired ends. (*In re Pipinos* (1982) 33 Cal.3d 189, 198.) In the parole context, the desired ends of a statement of reasons are to "guard against careless decisions," inform inmates "of the reasons why parole was denied," and aid judicial review. (*In re Sturm* (1974) 11 Cal.3d 258, 270.) As the Board's decision accomplishes each of these ends, it is procedurally adequate.

6

Lastly, as I noted in my dissent in the prior appeal, the Supreme Court has specifically reminded this court, "While the evidence supporting a parole unsuitability finding must be probative of the inmate's current dangerousness, it is not for the reviewing court to decide *which* evidence in the record is convincing. [Citation.] Only when the evidence reflecting the inmate's present risk to public safety leads to but one conclusion may a court overturn a contrary decision by the Board or the Governor. In that circumstance the denial of parole is arbitrary and capricious, and amounts to a denial of due process." (*In re Shaputis II*, *supra*, 53 Cal.4th at p. 211.) As I continue to find nothing arbitrary about the Board's decision and I am still not persuaded the only decision to be drawn from the record is that Ferguson is not presently dangerous, I cannot join in the majority's opinion.

McCONNELL, P. J.